[Crim. No. 36901. Second Dist., Div. Four. Mar. 16, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANKIE LEE JARDINE et al., Defendants and Appellants.

COUNSEL

Dennis L. Cava, Glen H. Schwartz and Quin Denvir, State Public Defender, under appointments by the Court of Appeal, Michael Tanaka and Cheryl Lutz, Deputy State Public Defenders, for Defendants and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Gary R. Hahn and Richard B. Cullather, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

FILES, P. J.—Appellants Eddy Gayland Rucker, Allan Deal Pridgen and Frankie Lee Jardine were jointly charged with the crime of robbery. (Pen. Code, § 211.) In addition Jardine was charged with personally using a firearm, to wit, a shotgun (Pen. Code, § 12022.5), and Rucker and Pridgen were charged with being armed with a shotgun. (Pen. Code, § 12022, subd. (a).) Following denial of a motion to

suppress Jardine entered a plea of guilty to the charge. After a jury trial Pridgen was found guilty as charged and a mistrial was declared as to Rucker. Following a second jury trial Rucker was found guilty as charged. Each appeals from the judgment imposed.

FACTS

On August 11, 1979, at about 11 p.m., Joseph Wasley was in his store, Mac's Market, in the City of Burbank when Pridgen and Jardine walked in. Jardine pointed a sawed-off shotgun at Wasley, and Pridgen ordered him to fill up a paper bag. Wasley emptied his cash register and put about $39 in the bag. After the two were convinced that Wasley had no floor safe, they left.

Wasley then picked up his gun and ran out the door "to see where they went to." When he found he could not see anyone, he returned to the store and told his wife to call the police.

THE DENIAL OF THE MOTIONS TO SUPPRESS

A. *The initial traffic stop, the search of the van and the search of Pridgen.*

A few minutes after the robbery the police radio broadcast a report that Mac's Market had been robbed by two male Caucasians in their twenties, one short with a reddish goatee and a watch cap or a ski cap, dark color, and the second taller, thin, with black stringy hair and a green T-shirt. The weapon was described as a sawed-off shotgun.

Officer Armstrong, who was on patrol about a mile away heard the broadcast and proceeded towards the scene. About 1 block from the market he saw a van, driven by a male caucasian in his 20's with stringy hair. He followed the van for a few blocks and observed it driving to the left of center after making a turn. He also saw an object, "approximately six by six," being thrown from the van. He stopped the van for the traffic violations and ordered the occupants out. They were Rucker, the driver, and Jardine and Pridgen. Armstrong noted that Jardine and Pridgen met the broadcast description of the two robbers.

A few minutes later a second police car arrived with Sergeant Valento and Officer Wilson. Valento looked into the van and found live

shotgun shells scattered on the floor, a dark colored ski cap and a grocery bag.

After arresting the passengers for robbery Sergeant Valento entered the van but was unable to see any shotgun. He then lifted up one of the plywood seats which had been built over the rear wheel wells of the van, and there found the sawed-off shotgun. In Pridgen's pocket Valento found $39.

■ Pridgen and Jardine contend there was no probable cause either to stop the van or to search the van once it was stopped. Pridgen additionally objects to the search of his pockets after his arrest.

After Officer Armstrong had observed two traffic violations, it was not improper to stop the van to issue the appropriate citations. (*People v. McGaughran* (1979) 25 Cal.3d 577, 582 [159 Cal.Rptr. 191, 601 P.2d 207].) Once he became aware there was more than one person in the van and they fit the broadcast description of the armed robbers, he was justified in asking everyone to alight from the van. (*People v. Mickelson* (1963) 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658]; *People v. Remiro* (1979) 89 Cal.App.3d 809, 829 [153 Cal.Rptr. 89].) The law did not require Officer Armstrong to make the choice of giving the driver immunity in violating the traffic laws or stopping the car and possibly walking into the firing path of a sawed-off shotgun. (*People v. Beal* (1974) 44 Cal.App.3d 216, 221 [118 Cal.Rptr. 272].)

■ Once the passengers were out of the van, the officers were able to see the live shotgun shells and ski mask which were in plain view from outside of the van. These observations added to the reasonableness of the belief that the sawed-off shotgun was still in the van. At this point the officers were no longer concerned with a traffic violation. This was a robbery investigation. Since the sawed-off shotgun was both contraband (Pen. Code, § 12029) and evidence of a crime, the officers had the right to search for it. (See *Carrol v. United States* (1925) 267 U.S. 132 [69 L.Ed. 543, 45 S.Ct. 280, 39 A.L.R. 790]; *Wimberly v. Superior Court* (1976) 16 Cal.3d 557 [128 Cal.Rptr. 641, 547 P.2d 417].)

Since the shotgun was not found in the open portion of the van, the officers had reasonable cause to look for it in one of the closed compartments. (See *Wimberly v. Superior Court, supra,* 16 Cal.3d 557, 573; *People v. Minjares* (1979) 24 Cal.3d 410, 423 [153 Cal.Rptr. 224, 591 P.2d 514]; *People v. Odom* (1980) 108 Cal.App.3d 100, 106 [166

Cal.Rptr. 283].) The investigation was being conducted on a public street in the middle of the night—circumstances which made it impractical to await the issuance of a search warrant. Under the circumstances it was not unreasonable to lift the unlatched wheel-well seat to locate and seize the shotgun.

■ Once the officers had arrested all three appellants the officers had the right to search Pridgen as an incident to his arrest. (*People* v. *Superior Court* (*Simon*) (1972) 7 Cal.3d 186, 201 [101 Cal.Rptr. 837, 496 P.2d 1205].)

B. *The taped conversations in the police car and in the jail.*

■ At the scene of the arrests Valento placed the 3 suspects in a police car which was equipped with a tape recorder, then left them alone for about 15 to 25 minutes. The recorded conversations were received in evidence at the trial.

These conversations were admissible. Appellants were not in a private place, and they could not have had any reasonable expectations of privacy as they sat, under arrest, in the police vehicle. (*People* v. *Newton* (1974) 42 Cal.App.3d 292, 296 [116 Cal.Rptr. 690].)

■ When Rucker's wife came to the jail to visit him, they were separated by a glass partition and conversed by telephone. The police tape recorded this conversation, as well as one that Jardine had under similar circumstances with a woman who came to visit him. The trial court denied motions to suppress these conversations.

The California decisions have established that intercepted jail house communications are also admissible because they cannot be said to have been made in confidence unless the police deliberately create an expectation of privacy.[1] (See *People* v. *Hill* (1974) 12 Cal.3d 731, 764 [117 Cal.Rptr. 393, 528 P.2d 1]; *North* v. *Superior Court* (1972) 8 Cal.3d 301, 308-312 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155].) Here there was no such showing. The trial court was correct in admitting this evidence.

[1]The admissibility of recorded jail house conversations is presently pending before the California Supreme Court. (*De Lancie* v. *Superior Court* (Cal.App.) (S.F. 24095) hearing granted Nov. 29, 1979; *Robinson* v. *Superior Court* (Cal.App.) (S.F. 24185) hearing granted June 25, 1980; and *People* v. *Maxie* (Cal.App.) (Crim. 21556) hearing granted July 16, 1980.)

THE IDENTIFICATION PROCEDURE

■ Pridgen contends that the in-court identification was tainted by the identification procedure which occurred at the arrest scene shortly after the robbery.

About 10 minutes after the crime, the victim, Wasley, was brought to the scene of the arrest. Before they started, the officers told him "We have a couple of guys down here we want you to look at." As soon as they arrived at the place of arrest, Wasley looked out of the police vehicle and said "That's the two guys right there." He did not recognize the third man.

This was a conventional field identification which courts recognize as not unduly suggestive or otherwise unfair. The special benefit of such a procedure is that the prompt viewing is more likely to produce an accurate response than a later confrontation. The identification evidence was properly received. (*In re Richard W.* (1979) 91 Cal.App.3d 960, 969 [155 Cal.Rptr. 11]; *People v. Anthony* (1970) 7 Cal.App.3d 751, 764 [86 Cal.Rptr. 767].)

THE BEAGLE RULING

■ Prior to trial Rucker made a motion to exclude reference to his prior convictions should he elect to take the stand. (See *People v. Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1].) In making the motion Rucker conceded he had suffered two second degree burglary convictions, one in 1971, one in 1974 and an attempted grand theft conviction in 1976, all in the State of Washington. Rucker's counsel informed the court that appellant would not testify if the prior convictions were allowed to be used for impeachment. The court responded: "The motion will be denied. He seems to periodically get in trouble; '71, and he goes to '74, and then he goes to '76. And now it's '79—like a wheel turning."

In *People v. Rollo* (1977) 20 Cal.3d 109, 116 [141 Cal.Rptr. 177, 569 P.2d 771], the court admonished trial courts as follows: "By now it should be clear to all that when a defendant makes a timely objection to the introduction of evidence of a prior felony conviction for the purpose of impeaching his testimony, the trial court is under a duty (1) to determine the probative value of that evidence on the issue of the defendant's credibility as a witness, (2) to appraise the degree of prejudice which

the defendant would suffer from admission of the evidence, and (3) to weigh the foregoing two factors against each other and exclude the evidence 'if its probative value [on the issue of credibility] is substantially outweighed by the probability that its admission will ... create substantial danger of undue prejudice, ...' (Evid. Code, § 352)." (See also *People* v. *Rist* (1976) 16 Cal.3d 211, 218-223 [127 Cal.Rptr. 457, 545 P.2d 833]; *People* v. *Antick* (1975) 15 Cal.3d 79, 96-99 [123 Cal.Rptr. 475, 539 P.2d 43].)

Here the court seemed to have ignored the balancing process. Allowing one prior offense to be used would have been adequate to impeach Rucker's character if such impeachment was to be allowed at all under the *Rollo* standard. By ruling that all three priors would be available for impeachment, the trial court apparently did not take into account the degree of prejudice that Rucker would suffer from admission of the evidence. If the trial court came to the conclusion that appellant's criminal activity was like a wheel turning it is not unlikely that the jury could and would come to the same conclusion, and the presumption of innocence would be seriously eroded.

We discuss below the question whether this error was prejudicial in the light of the entire record.

RUCKER'S PROPOSED INSTRUCTION ON THE CRIME OF BEING AN ACCESSORY.

In the trial court Rucker's counsel requested that the court give an instruction defining the crime of being an accessory after the fact. It was Rucker's theory that, in driving Pridgen and Jardine away from the robbery, he acted only as an accessory after the fact, as defined in Penal Code section 32,[2] and not as an accomplice, i.e., one who aids or abets. (Pen. Code, § 31.) And since the crime of being an accessory had not been charged in the information, and because that crime is not included within the charged offense of robbery, the jury would have been required to acquit him if it found him to have been an accessory rather than an accomplice.

---

[2]Penal Code section 32: "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony."

Rucker's counsel states the issue clearly in the opening brief in this court: "The requested instruction was not only amply supported by the evidence at trial; it represented appellant's sole defense. Appellant conceded he was with Alan Pridgen and Frankie Jardine, the alleged perpetrators of the robbery, both before and after the offense. Appellant conceded he drove the van away after Pridgen and Jardine returned informing him they had robbed the market. Appellant's only dispute with the prosecution theory was over what point in time appellant obtained knowledge of the offense. Appellant contended, through Pridgen's testimony, that he had no knowledge of the crime until *after* its completion."

We therefore turn to an analysis of Rucker's first assumption: that there was some evidence in the record which would support a finding that he was no more than an accessory. For this purpose we ignore the evidence which tended to show that Rucker had knowledge of the intent to rob before the threesome arrived at Mac's Market.

The evidence upon which Rucker relies was the testimony of Pridgen, who had been convicted at the first trial and then testified as a defense witness at Rucker's second trial. The pertinent part of Pridgen's testimony was in substance as follows: Jardine and Pridgen were on their way home in a van driven by Rucker when they passed Mac's Market. One of the passengers asked Rucker to go back and stop. Rucker complied, parking the van across the street from the market. Nothing was said in Rucker's presence about a robbery. Pridgen and Jardine entered the market, Jardine carrying a shot-gun and Pridgen carrying a paper bag.

Inside the market Pridgen placed the bag on the counter and told the attendant, Wasley, to fill it with bills. After Wasley had put bills in the bag, Pridgen ran out of the market to the van, entered the passenger door and shut the door. What occurred next was described by Pridgen thus:

"Q. [Mr. O'Neill, deputy district attorney] What did you tell the defendant Rucker when you got in the van?

"A. [Pridgen] I told him that we just robbed the store. And right when I was going past the store, when I looked behind me, I seen Mr. Wasley running after Defendant Jardine. And he had a pistol in his hand.

"Q. What was Mr. Rucker's response to your telling him 'We just robbed the store'?

"A. Well, he was mad.

"Q. Did you take off immediately?

"A. Just about, 'cause I was explaining to him and he looked over and he seen what was happening. He was watching what was happening, and then we drove off.

"Q. Where did you go when you drove off?

"A. We went up the street and drove around the block and came back.

"Q. How many times did you drive around the block?

"A. I was excited. I'm not too sure how many times.

"Q. More than once?

"A. I'm not sure. I was pretty excited.

"Q. When you drove around the block, did you eventually run into Mr. Jardine?

"A. We—yes, we were coming back towards the store.

"Q. Did he still have the shotgun on him?

"A. Yes.

"Q. Did you let him into the van?

"A. Yes.

"Q. How did he get into the van?

"A. Through the back door or—not the back doors, but kind of sliding door on the side."

Rucker then drove away and a few minutes later encountered the police, as has been described above.

Pridgen's testimony, though offered by the defense, clearly and unambiguously establishes that Rucker was an accomplice to the robbery, in that he knowingly aided Pridgen and Jardine to carry off the loot. Assuming that Rucker had no knowledge that a robbery was to be committed before Pridgen emerged from the market, he was told of the robbery while his van was parked across the street. From that point on, if not before, he was engaged in assisting Pridgen and Jardine to escape to a place of safety.

Since a robbery is a continuing crime which is not completed until the robbers reach a place of temporary safety, Rucker's assistance in the escape was necessarily a participation in the robbery.

In *People* v. *Laursen* (1972) 8 Cal.3d 192 [104 Cal.Rptr. 425, 501 P.2d 1145], the defendant had robbed a market and then commandeered a nearby automobile and compelled the driver to take him away. In holding that this constituted kidnaping for the purpose of robbery in violation of Penal Code section 209, the court said at pages 199-200: "This court has consistently recognized that '[r]obbery . . . is not confined to a fixed *locus*, but is frequently spread over a considerable distance and varying periods of time.' [Citations.] The assault of the victim, the seizure of his property and the robber's escape to a location of temporary safety are all phases in the commission of the crime of robbery linked not only by a proximity of time and distance, but a single-mindedness of the culprit's purpose as well. Accordingly, we conclude that when as in the instant case the finder of fact may have reasonably inferred and accordingly have found that the kidnaping of an individual was to effect a robber's escape such kidnaping is proscribed by the provisions of section 209.[6]"

Footnote 6, to the sentence quoted above, states: "Policy, as well as logic, dictates this result. Historically, our decisions concerning the felony-murder rule acknowledged at an early date that, as a practical matter, a robbery has not terminated until the robber reaches a location of temporary safety. (*People* v. *Dowell, supra*, 204 Cal. 109 [266 P. 807]; *People* v. *Boss, supra*, 210 Cal. 245 [290 P. 881].) Shortly afterwards (*People* v. *Kristy, supra*, 4 Cal.2d 504 [50 P.2d 798]), this concept was adopted without modification for use in ascertaining whether particular criminal conduct constitutes a violation of section 209. Because of the close similarity between the underlying policies of

felony murder and those of section 209, the transition was smooth. Through the imposition of harsher penalties, both seek to deter an aggravation of the risks to which persons involved in a robbery would otherwise be exposed. And to this extent both are reflections of the skeptical, though sensible, belief that a transgressor's intention to avoid physical injury at the time he embarks upon the venture of perpetrating a robbery serves as no reasonable safeguard that death or physical injury will not result before he finishes...."

In *People* v. *Salas* (1972) 7 Cal.3d 812, 820-824 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832], a robber, fleeing in an automobile, was halted by police 1.2 miles from the scene of the robbery. In attempting to escape from the officers, he killed one of them. The Supreme Court upheld a conviction of murder "which is committed in the perpetration of, or attempt to perpetrate ... robbery."

In applying these principles to the present case we follow the "policy, as well as logic," referred to in *Laursen*. The violent crime of robbery creates great physical risks during the escape as well as during the taking. One who knowingly participates in the second phase is, under the historic concept of the crime of robbery, culpable as a principal. In the present case it was sheer good fortune that when Wasley emerged from the market, gun in hand, Pridgen had entered the van and that Wasley did not see where Jardine, with his shotgun, had gone.

The law with respect to participation in a robbery must be distinguished from the cases involving such crimes as burglary, which does not include any element of asportation or flight. (See e.g., *People* v. *Markus* (1978) 82 Cal.App.3d 477 [147 Cal.Rptr. 151].)

The statement is frequently made in the cases that "prior knowledge" is necessary in order to be an aider and abettor, i.e., a principal in a crime. But knowledge that a robbery is in progress is "prior knowledge" when a person joins in completing that offense by aiding the escape.

Thus in *People* v. *Mansour* (1951) 103 Cal.App.2d 592, 601 [230 P.2d 52], in affirming the conviction of the driver of the getaway car, the court said: "In view of the nature of her long association with Baranik, it was a rational inference that she did not drive him 19 miles after leaving the pharmacy without ascertaining that the 'some trouble' he had had was his robbery of the druggist, *even conceding that she had no prior knowledge of his purpose.*" (Italics added.)

*People* v. *Prado* (1977) 67 Cal.App.3d 267 [136 Cal.Rptr. 521], relied upon by Rucker's counsel, will not assist Rucker here. In that case the codefendant Gonzales was charged with both the offense of robbery and the offense of being an accessory to the robbery (Pen. Code, § 32); and the jury was instructed that it could find Gonzales guilty of either or both crimes. The jury found him guilty of both. The court then sentenced Gonzales on the robbery count only and dismissed the accessory charge. The Court of Appeal pointed out that guilt as a principal and as an accessory are mutually exclusive, and held that the erroneous instruction compelled a reversal. The opinion does not state the evidence upon which it might have been determined whether the robbery was or was not complete at the time Gonzales aided his codefendant Prado. Despite some unnecessary language in the opinion, this decision did not conflict with the historic view that a robbery is not complete until the robbers have made their way "to a place of temporary safety."

Nor is appellant assisted by the cases holding that a robber who fails to make a successful escape may be convicted of robbery rather than a mere attempt. (See *People* v. *Beal* (1934) 3 Cal.App.2d 251 [39 P.2d 504]; *People* v. *Clark* (1945) 70 Cal.App.2d 132, 133 [160 P.2d 553].) As is explained in *People* v. *Laursen*, quoted *supra* (8 Cal.3d 192, 199), the commission of robbery is "frequently spread over a considerable distance and varying periods of time." The taking of property by force or fear, even for a brief period of time, is deemed sufficiently culpable to be punished as robbery. The distinction between the use of the word "complete" to indicate when culpability attaches, and the use of the same word to indicate when commission has terminated is pointed out in *People* v. *Price* (1972) 25 Cal.App.3d 576, 580 [102 Cal.Rptr. 71].

The continuing nature of the crime of robbery is further illustrated by *People* v. *Carroll* (1970) 1 Cal.3d 581 [83 Cal.Rptr. 176, 463 P.2d 400]. In that case the defendant held up his victim, Gulsvig, in the restroom of a bar and took nothing except Gulsvig's wallet. When he discovered that the wallet was empty, he threw it on the wash basin. The defendant then followed Gulsvig into the bar and shot him. In affirming a conviction for robbery, with enhanced punishment for great bodily injury inflicted during the commission of the robbery, the court said at pages 584-585: "The fact that defendant was not engaged in the asportation of any loot at the time he shot Gulsvig is immaterial. He became angry after discovering no money in the wallet and having the rest room door slammed in his face. His purpose in running into the bar

appears to have been to exact his revenge from Gulsvig. Under the circumstances, the robbery and shooting of Gulsvig constituted one indivisible transaction, with the shooting flowing directly from the taking of the wallet.

"In addition, it is settled that the crime of robbery is not confined to the act of taking property from victims. The nature of the crime is such that a robber's escape with his loot is just as important to the execution of the crime as obtaining possession of the loot in the first place. Thus, the crime of robbery is not complete until the robber has won his way to a place of temporary safety. [Citations.] In the present case, defendant had not won a place of temporary safety at the time he shot Gulsvig, as a result of which the robbery of Gulsvig had not been completed, and the shooting occurred 'in the course of commission of the robbery' of Gulsvig."

In the present case, upon the evidence offered by Rucker in his own defense, it appears clearly and without conflict that his participation was that of a principal and not an accessory as defined in Penal Code section 32. There was no evidence which would have supported a finding that Rucker was an accessory. Therefore the court properly refused to give an instruction based on section 32.

THE CLAIM OF PREJUDICE

■ The question is whether or not Rucker was prejudiced by the error of the trial court in denying his pretrial motion to exclude evidence of some or all of his three prior convictions. Since appellant did not testify, the prior convictions were never made known to the jury. The prejudice claimed is that the court's ruling caused him to elect not to testify in his own behalf.

Article VI, section 13, of the California Constitution provides: "No judgment shall be set aside, or new trial granted, . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

The test to be applied is stated in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]: "That a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable

that a result more favorable to the appealing party would have been reached in the absence of the error."

Rucker's single defense, as urged in the trial court and here, was that he had no prior knowledge of the robbery. But the testimony of Pridgen, as Rucker's witness at the trial, showed that no such defense was available. Pridgen's testimony, that Rucker became aware of the robbery before he drove the van from its parking place across the street from the market, is reinforced by all the other evidence which supports the People's case. Other evidence establishes that Pridgen did board the van, carrying a paper bag of money; Jardine did come out of the market carrying a shotgun, followed by Wasley, brandishing a pistol; and Rucker did drive the van around the block to find Jardine. In this case, unlike *People* v. *Spearman* (1979) 25 Cal.3d 107, 119 [157 Cal.Rptr. 883, 599 P.2d 74], we do have a basis for concluding that a retrial, with Rucker testifying on his own behalf, would not result more favorably to him. We must conclude that there was no miscarriage of justice and that the error does not require a reversal and a retrial.

SENTENCING ERROR

■ Jardine contends that the court erred in not stating its reasons for denying probation on the record. Here no one was even considering probation. The prosecutor was arguing for a state prison sentence, and Jardine's counsel was arguing for a Youth Authority commitment. Any such statement of reasons in this case would have been superfluous. Moreover, the Supreme Court has refused to require trial courts to state their reasons for denying probation as long as those proceedings are reported. (*People* v. *Edwards* (1976) 18 Cal.3d 796, 805 [135 Cal.Rptr. 411, 557 P.2d 995].) That same rule is applicable to sentences under the Determinate Sentencing Act. (*People* v. *Ramos* (1980) 106 Cal.App.3d 591 [165 Cal.Rtpr. 179].)

■ The sentence imposed on Rucker was made up of the high base term of five years (Pen. Code, § 213), a one-year enhancement for the possession of a firearm by one of the principals (Pen. Code, § 12022, subd. (a)), and three one-year enhancements for the three prior felony convictions (Pen. Code, § 667.5, subd. (b)), for a total of nine years. Rucker points out, correctly, that the court's statement of reasons (required by Pen. Code, § 1170, subd. (b)) for selecting the upper term reflects an erroneous dual use of facts. That section provides, "The court may not impose an upper term by using the fact of any enhance-

ment upon which sentence is imposed under section 667.5, 1170.1, 12022, 12022.5, 12022.6 or 12022.7."

In explaining the choice of the upper term, the court stated that as it viewed the record and the probation report, Rucker had a position of leadership in the crime and that the crime showed some premeditation and planning. The court then added: "And the other aggravation is crystal clear, and that is the defendant's prior convictions. He served three times in the penitentiary in Washington."

The first two circumstances mentioned by the court were matters which the court was entitled to consider in aggravation. (Cal. Rules of Court, rule 421 (a).) But the fact of the three prior convictions was used to impose an additional three years under Penal Code section 667.5, and therefore should not have been considered as a reason for imposing the upper base term. This is not a case in which we can assume that the trial court's reference to the prior convictions did not influence the court's selection of the upper term. Defendant should be returned for a new determination as to whether the upper base term shall be imposed, unless the People elect not to seek a resentencing.

As to the appellants Jardine and Pridgen, the judgments are affirmed. As to appellant Rucker, the conviction is affirmed, and the sentence is vacated if the People elect to bring appellant Rucker back for resentencing within 30 days from the date this decision becomes final. If the People do not elect to bring appellant Rucker back to the trial court for resentencing within thirty days from the date this decision becomes final, the sentence heretofore imposed is modified by substituting the middle base term of three years in place of the upper term of five years, making the total term including enhancements, seven years.

Woods, J., and Laidig, J.,* concurred.

The petition of appellant Rucker for a hearing by the Supreme Court was denied June 3, 1981. Caldecott, J.,* participated therein. Bird, C. J., and Tobriner, J., were of the opinion that the petition should be granted.

Pursuant to order of the Court of Appeal, Second Appellate District, Division Four, filed June 29, 1981, the court recalled its remittitur and corrected the last sentence of its opinion to read as printed above.

*Assigned by the Chairperson of the Judicial Council.