[Crim. No. 4141. Fifth Dist. Sept. 30, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
FREDDIE LEON ROGERS, Defendant and Appellant.

[redacted]

## COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Martin M. Spiegel, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, James T. McNally and Carla J. Caruso, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**FRANSON, Acting P. J.—**

### STATEMENT OF THE CASE

Appellant stands convicted of first degree murder and robbery after a jury found him guilty of these offenses, and the trial court found he was sane when he committed the offenses. He was sentenced to life imprisonment for the murder conviction and his sentence was enhanced by one year for weapon use. Appellant received a concurrent sentence of

four years (the upper term) on the robbery conviction plus a one-year enhancement for weapon use.

On appeal, appellant makes several contentions: (1) the trial court prejudicially erred by failing to explicitly instruct the jury that the defense of diminished capacity could negate the state of mind necessary for murder by means of lying in wait; (2) the separate sentence on the robbery count violated Penal Code section 654; and (3) the trial court erred in imposing a weapon use enhancement on both counts.

### The Evidence

On June 5, 1978, the body of Jimmie Lee Hendrix was found in a canal in Stanislaus County wrapped in a green army-type sleeping bag. The body had only been in the water for several hours but, according to a pathologist who examined the body, Hendrix had been dead about three days. The cause of death was a combination of stab wounds to the chest, neck and face, as well as blows on the head with a blunt object.

After seeing an article about this in the newspaper, Brenda Muller contacted the sheriff's office and informed them that her husband had loaned appellant a green army-type sleeping bag on June 3. She was able to identify the bag due to the location and patching of several tears.

Officers obtained a warrant to search the apartment of appellant's sister, Giletta Dollarhide, and when the warrant was executed officers found blood stains on the rugs, walls, and drapes. Some of the stains appeared diluted or washed out and there was an odor of Lysol. The bloodstains on the rug and drapes were determined to be of the same blood type as that of the victim.

Appellant was arrested on June 8. At first he declined to make a statement, but later while in jail, appellant contacted authorities and indicated he wanted to confess. Appellant signed a *Miranda* waiver and was interviewed by Detective Mac Reece.[1]

Appellant gave Officer Reece the following account of the homicide and events leading up to it. On Friday, June 2, appellant and Danny

---

[1]The interview was tape recorded. The recording was played at trial and transcripts thereof were furnished to jurors to assist them in following the tape.

Wettstein were at the home of appellant's sister Giletta Dollarhide eating dinner with Giletta when Jimmie Lee Hendrix arrived. Hendrix had been involved with Giletta, and according to appellant, Giletta wanted nothing more to do with Hendrix, but she couldn't get rid of him. Hendrix had threatened to kill members of appellant's family and Hendrix previously had been convicted of manslaughter; he had also raped appellant's sister, according to appellant.

Giletta and Hendrix were in the bedroom talking when appellant heard Hendrix make more threats to kill Giletta and everyone else in the family. Something "came over" appellant and he picked up a tire iron, then hit Hendrix on the head with it. Hendrix fell back and when he tried to get up, appellant hit him again. After hitting Hendrix repeatedly, appellant then stabbed Hendrix with a knife Hendrix had been using to fix a lighter. Appellant explained the killing by saying that "it just went crazy on me .... I just freaked, man ...."

Appellant told Officer Reece that he took $400 or $500 from Hendrix' wallet and gave $150 of that money to his sister, while keeping the rest.

Appellant also told Officer Reece that he and Wettstein disposed of the body the following Monday morning by bundling it up in a sleeping bag borrowed from Ernie Muller and dumping it into the canal. Giletta cleaned up the bloodstains at the apartment.

The prosecution also introduced evidence that on June 2 (the day of the homicide), appellant had a conversation with Michael Flinders in which appellant told Flinders he planned to take Hendrix' money, kill Hendrix and make it look like self-defense.[2]

### DEFENSE EVIDENCE

Appellant's sister Giletta testified that on the day of the homicide, she, appellant, and Danny Wettstein took about 20 "reds" together. She said she could tell appellant was under the influence because he was bumping into aisles when the group went to the market at about 1:30

---

[2]This testimony was given by Detective Breshears who had been told about the conversation by Flinders; Breshear's testimony was allowed as impeachment evidence against Flinders, who was evasive at trial about appellant's statements to him.

p.m. Giletta gave the following account of the homicide. About an hour after she, appellant, Danny, and Hendrix had lunch together at Giletta's apartment, she and Hendrix went into the bedroom to talk. Appellant and Danny entered the room when the conversation between Giletta and Hendrix became argumentative. Appellant calmly told Hendrix to leave and Hendrix answered in a belligerent manner that Giletta could make up her own mind. Hendrix, who was holding a knife which he had been using to fix a cigarette lighter, began to get up. Appellant hit him with the tire iron. According to Giletta, Hendrix then went at appellant with the knife, and appellant responded by hitting Hendrix again; Giletta then left the room.

Giletta thought appellant was under the influence of drugs when he killed Hendrix, because appellant's eyes were "glassy and dilated." Giletta testified that when she was interviewed by law enforcement officers before trial, she had neglected to mention appellant's drug usage and the facts suggesting that the killing might have been in self-defense because the whole thing was too "ugly" to discuss.

Dr. Patricia White, a psychiatrist, testified that she had interviewed appellant, studied his medical records, and had listened to the tape recording of appellant's interview with Detective Reece. In her opinion, appellant was suffering from psychosis which substantially interfered with his thought processes. Although she believed that appellant was capable of forming the specific intent to commit robbery, "which is to permanently deprive someone of their property," and was able to "form the specific intent to kill," she did "not believe that he had the mental state—mental capacity to form the mental state to maturely and meaningfully reflect upon that decision; to weigh the pros and cons in the sense of deliberating it; be aware of the possible consequences and have other alternatives and then choose after having been able to do those things." Nor did she believe appellant could have harbored malice aforethought when he killed Hendrix.

### Rebuttal

To rebut appellant's evidence with respect to his diminished capacity, the prosecution called Dr. Philip S. Trompetter, a clinical psychologist, who testified that he interviewed appellant at the county jail and that his examination showed no evidence of gross mental illness or mental defects.

## DISCUSSION

■ Appellant first contends the trial court should have specifically instructed the jury *sua sponte* that diminished capacity can negate the "state of mind equivalent to premeditation or deliberation" which must be found before a defendant can be convicted of murder by means of lying in wait.[3]

The court did instruct the jury as to the following version of CALJIC No. 8.77 on diminished capacity: "If you find from the evidence that at the time the alleged crime was committed, the defendant had substantially reduced mental capacity, whether caused by mental illness, mental defect, intoxication or any other cause, *you must consider what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder and voluntary manslaughter.*

"Thus, if you find that the defendant's mental capacity was diminished to the extent that you have a reasonable doubt whether he did, maturely and meaningfully, premeditate, deliberate, and reflect upon the gravity of his contemplated act, or form an intent to kill, you cannot find him guilty of a wilful, deliberate and premeditated murder of the first degree.

"Also, if you find that the defendant's mental capacity was diminished to the extent that you have a reasonable doubt whether he was able to form the mental states constituting either express or implied malice aforethought, you cannot find him guilty of murder of either the first or second degree.

"If you have a reasonable doubt [1] whether he was able to form an intention unlawfully to kill a human being, or [2] whether he was aware

---

[3]The state of mind necessary for murder by lying in wait was explained to the jury as follows: "Murder which is immediately preceded by lying in wait is murder of the first degree.

"The term 'lying in wait' is defined as a waiting and watching for an opportune time to act, together with a concealment by ambush or some other secret design to take the other person by surprise. The lying in wait need not continue for any particular period of time *provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.*

"To constitute murder by means of lying in wait there must be, in addition to the aforesaid conduct by the defendant, an intentional infliction upon the person killed of bodily harm involving a high degree of probability that it will result in death and which shows a wanton disregard for human life." (Italics added.)

of the duty imposed on him not to commit acts which involve the risk of grave injury or death, or [3] whether he did act despite that awareness, you cannot find that he harbored express malice.

"Further, if you have a reasonable doubt [1] whether his acts were done for a base, anti-social purpose, or [2] whether he was aware of the duty imposed on him not to commit acts which involve the risk of grave injury or death, or [3] whether he did act despite that awareness, you cannot find that he harbored implied malice.

"Furthermore, if you find that as a result of mental illness, mental defect, or intoxication, or a combination thereof his mental capacity was diminished to the extent that he neither harbored malice aforethought nor had an intent to kill at the time the alleged crime was committed, you cannot find him guilty of either murder or voluntary manslaughter." (Italics added.)

■ The trial court is required to instruct the jury *sua sponte* on "'the general principles of law relevant to the issues raised by the evidence.... The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.'" (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913], quoting *People* v. *St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390].) ■ "[W]here evidence of diminished capacity has been presented the court must instruct the jury on the possible relevance of that evidence to finding the existence of the mental elements that are part of the offense of murder [citations], and must also instruct the jury on voluntary manslaughter in the diminished capacity context" (*Sedeno, supra*, 10 Cal.3d at p. 716).

■ The version of CALJIC No. 8.77 read to the jury and quoted above contains language broad enough to advise the jury that diminished capacity can have an effect on "... any of the specific mental states that are essential elements of murder ...." It told the jury that it should consider the evidence of diminished capacity on the defendant's ability to premeditate, deliberate, and to reflect upon the gravity of his contemplated act; to form an intent to kill, to act with express or implied malice, and to refrain from committing acts involving the risk of grave injury or death. The court also instructed the jury on both voluntary and involuntary manslaughter in the diminished capacity context. Thus, the jurors knew the mental state necessary for lying in wait, knew

they had to consider the effect of diminished capacity on any of the specific mental states that are essential elements of murder and knew that if no malice was present due to diminished capacity the killing could not be murder but could only be voluntary or involuntary manslaughter.

Furthermore, the jury was instructed in the language of CALJIC No. 3.35 which states that when a defendant is charged with a crime requiring a specific intent or mental state, the jury must consider whether the defendant was suffering from some abnormal mental or physical condition which would prevent him from forming the specific intent or mental state required for the crime charged.

Thus, the trial court fulfilled its duty to instruct *sua sponte* on the general principles of law governing the case. If appellant wanted a more specific instruction expressly tying the diminished capacity concept to murder by lying in wait, he had to request such an instruction. Having failed to make such a request, the trial court was under no duty to give it (cf. *People* v. *Ross* (1979) 92 Cal.App.3d 391, 404 [154 Cal.Rptr. 783]).

■ Appellant next contends the trial court should have stayed his sentence on the robbery count; he argues that Penal Code section 654[4] prohibited the court from sentencing him for both the murder and the robbery since the two crimes were "based upon the same indivisible facts."

■ When two crimes are incident to one objective, the defendant may be punished for the most serious offense but not for both crimes. (Pen. Code, § 654; *Neal* v. *State of California* (1960) 55 Cal.2d 11, 19-20 [9 Cal.Rptr. 607, 357 P.2d 839].)

■ The problem in the present case is that the evidence supports a finding either (1) a single objective, i.e., the killing was done to facilitate the robbery which was appellant's sole objective, or (2) separate objectives, i.e., he killed his victim for a purpose unconnected with the robbery—for example, to prevent harm to his family.

Although appellant was convicted of first degree murder, the jury did not specify whether the killing was in the course of perpetrating the

[4]Penal Code section 654 provides: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; ..."

robbery, or was a willful and premeditated killing or a killing by lying in wait.

The prosecution introduced evidence that on the day of the killing, appellant told Flinders he planned to take Hendrix' money, kill him and make it look like self-defense. This would support a finding of a killing to facilitate a robbery thereby precluding multiple punishment for the robbery and the killing. (*In re Henry* (1966) 65 Cal.2d 330 [54 Cal. Rptr. 633, 420 P.2d 97]; *People v. Ridley* (1965) 63 Cal.2d 671 [47 Cal.Rptr. 796, 408 P.2d 124]; *People v. Chapman* (1968) 261 Cal. App.2d 149, 179 [67 Cal.Rptr. 601].)

The trial court has the serious responsibility of determining the facts relevant to proper sentencing under Penal Code section 654. (See Keene, Cal. Criminal Trial Judges Benchbook (1981) pp. 578-581; *People v. Chapman, supra*, 261 Cal.App.2d 149, 180; *People v. Flores* (1968) 267 Cal.App.2d 452, 459 [73 Cal.Rptr. 118]; see also *People v. Venegas* (1970) 10 Cal.App.3d 814, 826-828 [89 Cal.Rptr. 103], where then Presiding Justice Kaus refers to the problem of using the trial record as the source of facts necessary to a § 654 determination.)

Although the trial judge in the instant case did state his reasons for imposing an aggravated term for the robbery, he did not indicate his belief or make any findings as to the motivation for the killing; hence, we are unable to give a meaningful review to appellant's double punishment contention.

Appellant is entitled to have the trial court make the appropriate finding as to his intent and overall objective in killing Hendrix and to sentence accordingly.

■ Appellant's last contention is that the trial court could not enhance both the murder and robbery counts separately because this would violate the rule of *In re Culbreth* (1976) 17 Cal.3d 330 [130 Cal.Rptr. 719, 551 P.2d 23]. *Culbreth* held that when a defendant uses a firearm (or other weapon) in several crimes which are an indivisible transaction with "one intent, one objective," the court may only add one sentencing enhancement for firearm (or weapon) use (*id.*, at p. 335).

The Attorney General contends that *Culbreth* has been rendered obsolete by the enactment of the determinate sentencing law. This court has just rejected such a contention and held that *Culbreth* has continu-

ing vitality (*People* v. *Edwards* (1981) 117 Cal.App.3d 436, 447-448 [172 Cal.Rptr. 652], per Allen, J., with Franson, Acting P. J., and Hopper, J., concurring).

However, the *Culbreth* rule does not pose the real problem with the enhancements in this case. The real problem is that appellant was sentenced to life imprisonment on the murder and our Supreme Court has held that an enhancement pursuant to Penal Code section 12022 cannot be added to a conviction where the sentence is life imprisonment (*People* v. *Meredith* (1981) 29 Cal.3d 682, 696 [175 Cal.Rptr. 612, 631 P.2d 46]; *People* v. *Walker* (1976) 18 Cal.3d 232, 243 [133 Cal.Rptr. 520, 555 P.2d 306]).

We assume the trial court will correctly apply these rules on resentencing.

The judgment is affirmed. The matter is remanded to the trial court for resentencing in accordance with the views expressed herein.

Andreen, J., and Pettitt, J.,* concurred.

A petition for a rehearing was denied October 27, 1981, and appellant's petition for a hearing by the Supreme Court was denied November 25, 1981.

---

*Assigned by the Chairperson of the Judicial Council.