[Crim. No. 21346. First Dist., Div. Four. Mar. 1, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
JESSE ALBERT DURAN, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Richard S. Kessler and Mark Fogelman, Deputy State Public Defenders, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Robert R.

Granucci and Herbert F. Wilkinson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CHRISTIAN, J.**—Jesse Duran appeals from a judgment of imprisonment after a jury found him guilty of murder in the second degree (Pen. Code, § 187.)

Lydia Sheridan gave a large party at her house in San Jose. Appellant and his wife attended the party, and appellant played pool from about 6 to 9 p.m. During this period he had about five cups of beer.

During the evening appellant saw Michael Smith, the victim, fondling Mrs. Duran. Appellant grabbed Smith and told him to keep away from his wife. Later that night, appellant went outside and found that his wife had been thrown into a tub fully clothed. Smith was one of the persons responsible for throwing her in. Appellant went over and saw that Smith had grabbed Mrs. Duran's breasts from behind. He kicked Smith's hand away.

After this incident, appellant led his wife into the kitchen and told her to wait while he looked for some towels. When appellant returned with a towel, his wife was gone. After looking for about 20 to 25 minutes, appellant found his wife with Smith in front of a van in the Sheridan driveway. Smith had Mrs. Duran up against the van and had his hand underneath her blouse, attempting to remove her clothes. Appellant tried to grab Smith, but he ran away. After some recriminations appellant placed his wife in their car.

A few minutes later Smith, apparently drunk, walked up to appellant. Appellant asked Smith what he had been doing with Mrs. Duran. Smith did not respond directly to the question, suggesting instead that they talk about the matter. As the conversation continued, a shiny object was seen in appellant's right hand. Smith asked appellant, "Why do you have that knife?" Appellant told Smith not to worry about the knife as he could have stabbed Smith earlier at the party if that had been his intention; appellant continued to request an explanation for what had happened.

Appellant continued to ask what had happened with his wife and stated, "Tell me what happened or we are going to fight." Appellant added, "If we fight, one of us is going to die." After more angry words, appellant hit Smith in the face, knocking him against a parked car. Appellant then hit Smith two more times. Smith lunged at appellant, not making contact, and ran back toward the party.

Appellant ran after Smith; as the two ran toward the side of the Sheridan house, witnesses momentarily lost sight of them. Appellant and Smith went behind a van in the driveway; about 15 to 35 seconds later, appellant ran back to the street alone. As he ran past the witness, appellant said, "He was out of line, wasn't he?" The two witnesses saw the glare of an object appellant was holding in his hand. Appellant put the object in his pocket, went to his car, and drove away.

The witnesses ran to the back yard and found Smith lying on the ground bleeding from his chest.

Smith died of a deep stab wound to the heart.

## I

Appellant was soon arrested and taken to the detective bureau of the San Jose Police Department. After the detectives asked appellant preliminary questions, Sergeant Demkowski read appellant a *Miranda* warning and the following conversation occurred:

"DEMKOWSKI: Having these rights in mind, do you want to talk to us about the activities last night?

"A: First of all, let me ask you a question. Am I charged with this homicide?

"Q: You're under arrest for homicide, yes.

"A: Well then I think it's better that I have an attorney here. But other than that, I'll give you my version of it, you know. Don't ask me no questions. All right? Is that okay?

"Q: You don't want us to ask you any questions?

"A: No.

"Q: Okay.

"A: I'll just tell you what, you know, what I did and, you know but I mean, or have you got an attorney right here present, close?

"Q: It will take quite a while to get one. But go ahead.

"A: You got a recording or anything, you want to record it?

"Q: It's being recorded.

"A: Huh?

"Q: It's being recorded.

"A: Oh, okay. Ah . . . okay, this is yesterday, right?

"Q: Yeah.

"A: We decided to go to visit my sister-in-law, my wife's sister . . . ."

Appellant argues that it was error for the trial court to deny a motion *in limine* (Evid. Code, § 402) to suppress the statements elicited in this interrogation. The Attorney General responds that the trial judge made findings that "One, the defendant was given his *Miranda* rights, and said that he understood them. Two, that the defendant never asked for an attorney. And three, that he wanted to and intended to tell his version of the event." He argues that these findings are dispositive of the *Miranda* issue. ■ The trial court's findings are to be accepted by this court if not "palpably erroneous." (*People* v. *Duren* (1973) 9 Cal.3d 218, 238 [107 Cal.Rptr. 157, 507 P.2d 1365].) Here, as we shall explain, the trial court's determination that there was no *Miranda* violation was indeed palpably erroneous.

■ Appellant argues that he twice invoked his right to an attorney, thus triggering the "per se" rule that all interrogation must cease. (*Michigan* v. *Mosley* (1975) 423 U.S. 96, 109-110 [46 L.Ed.2d 313, 324-325, 96 S.Ct. 321] [White, J., conc.]; *Fare* v. *Michael C.* (1979) 442 U.S. 707, 719 [61 L.Ed.2d 197, 208, 99 S.Ct. 2560].) He further argues that because following these invocations he never initiated without reservation a renewal of interrogation, statements obtained during the interrogation should have been excluded.

The first question is whether appellant invoked his right to an attorney. In *People* v. *Randall* (1970) 1 Cal.3d 948, 955 [83 Cal.Rptr. 658, 464 P.2d 114], the court stated: "[A] suspect may indicate that he wishes to invoke the privilege by means other than an express statement to that effect; no particular form of words or conduct is necessary. . . . [¶] To strictly limit the manner in which a suspect may assert the privilege, or to demand that it be invoked with unmistakable clarity (resolving any ambiguity against the defendant) would subvert *Miranda's* prophylactic intent." The court held that, absent any evidence to the contrary, "a telephone call to an attorney must be construed to indicate that the suspect desires to invoke his Fifth Amendment privilege." (*Id.*, at p. 958.) Similarly, in *People* v. *Superior Court (Zolnay)* (1975) 15 Cal.3d 729 [125 Cal.Rptr. 798, 542 P.2d 1390] [cert. den. (1976) 429 U.S. 816 (50 L.Ed.2d 76, 97 S.Ct. 58)], the words "Do you think we need an attorney?" or "I guess we need a lawyer" were held to indicate an invocation of

the right to remain silent. (*Id.*, at p. 735, 736.) In all, a suspect may invoke his right to silence by any words or conduct reasonably inconsistent with a present willingness to discuss his case freely and completely. (*People* v. *Burton* (1971) 6 Cal.3d 375, 382 [99 Cal.Rptr. 1, 491 P.2d 793]; see also *People* v. *Parker* (1975) 45 Cal.App.3d 24 [119 Cal.Rptr. 49].)

Under this standard appellant did invoke his *Miranda* rights. Assuming that appellant's first statement that "it's better that I have an attorney here" did not constitute an invocation, appellant's question "Have you got an attorney right here present, close?" must be so construed. Further, appellant made two statements indicating a present unwillingness to freely talk without first meeting with an attorney. Ambiguous statements are to be construed as invocations. "A principal objective of [the *Miranda*] decision was to establish safeguards that would liberate courts insofar as possible from the difficult and troublesome necessity of adjudicating in each case whether coercive influences . . . had been employed to secure admissions or confessions." (*People* v. *Ireland* (1969) 70 Cal.2d 522, 535 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].) If courts were to construe ambiguous references to attorneys as something other than invocations of a suspect's right to remain silent, experienced criminals would get attorneys and not incriminate themselves, while less experienced offenders would be "trapped" by failing to use the precise words of invocation. (See *People* v. *Randall, supra,* 1 Cal.3d 948, 955.) Because appellant invoked his right to have an attorney present all questioning should have ceased. (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 474 [16 L.Ed.2d 694, 723, 86 S.Ct. 1602, 10 A.L.R.3d 1074].) There was no later waiver of *Miranda* rights by appellant. (See *Edwards* v. *Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880] [reh. den. 452 U.S. 973 (69 L.Ed.2d 984, 101 S.Ct. 3128)].)

Appellant told the detective that he was not involved in any fight and that the only scuffle he had was with his wife. At trial he testified (on direct examination) that he and Smith had a fight during which he hit Smith three times; appellant even admitting killing Smith. Appellant's statements to the police, though exculpatory, were inconsistent with his trial testimony and thus constituted admissions; they were used to impeach him. In *Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643], the United States Supreme Court held that under the United States Constitution, statements taken in violation of *Miranda* requirements, though unusable by the prosecution in its own case, are admissible to impeach statements made by the defendant in the course of his direct testimony. (See also *Oregon* v. *Hass* (1975) 420 U.S. 714 [43 L.Ed.2d 570, 95 S.Ct. 1215].) ■ However, in *People* v. *Disbrow* (1975) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272], the California Supreme Court rejected the contention that the rule in *Harris* v. *New York, supra,* determines the admissibility, in California courts, of statements obtained in violation of *Miranda,* and held that as a matter of *state* constitutional law (the privilege

against self-incrimination of Cal. Const., art. I, § 15), such statements may not be admitted. (*Id.*, at p. 113.) In the present case appellant's statements to the police were used to impeach his in-court testimony; their admission was thus improper as a matter of California, rather than federal, constitutional interpretation.[1]

The consequence of the error must be determined. The court committed state law error under *Disbrow* in admitting for impeachment purposes the unlawfully obtained statements of appellant. Under the California Constitution such error is reversible only where the reviewing court believes that it resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.) In *People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243] [cert. den. (1957) 355 U.S. 846 (2 L.Ed.2d 55, 78 S.Ct. 70)], the court held that "a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Id.*, at p. 836; see, e.g., *People* v. *Starkey* (1965) 234 Cal.App.2d 822, 831 [44 Cal.Rptr. 738]; *People* v. *Saldana* (1965) 233 Cal.App.2d 24, 32-33 [43 Cal.Rptr. 312], cert. den. (1966) 384 U.S. 1026 [16 L.Ed.2d 1032, 86 S.Ct. 1938]; *People* v. *De Leon* (1965) 236 Cal.App.2d 530, 537 [46 Cal.Rptr. 241] ["admissions do not require a reversal unless, in the light of the entire record, the error has resulted in a miscarriage of justice."]. ■ Here, the court gave no instructions requiring the jury to consider appellant's statement only for the purposes of assessing credibility. Its instructions left the jury free to consider appellant's prior inconsistent statement as evidencing consciousness of guilt. As the court's failure to deliver limiting instructions in effect permitted affirmative use by the prosecution of the statement, appellant submits that this omission transformed the state law error into one of federal constitutional magnitude. Accordingly, he urges that the more stringent standard of "harmless beyond a reasonable doubt" is applicable in determining whether prejudice occurred. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

■ Although the court was bound to instruct the jury *sua sponte* on the general principles of law applicable to a case, this obligation does not extend to instructions limiting the purposes for which particular evidence may be considered. A defendant's failure to request such limiting instructions waives the issue. (*People* v. *Soltero* (1978) 81 Cal.App.3d 423, 430 [146 Cal.Rptr. 457], cert. den. 439 U.S. 933 [58 L.Ed.2d 328, 99 S.Ct. 325]; *People* v. *Harris* (1977) 71 Cal.App.3d 959, 966 [139 Cal.Rptr. 778]; *People* v. *Demond* (1976) 59 Cal.App.3d 574, 589-590 [130 Cal.Rptr. 590].) The California Supreme Court decided *People* v. *Nudd* (1974) 12 Cal.3d 204 [115 Cal.Rptr. 372, 524

---

[1] We need not reach, on this record, the possible effect of California Constitution, article I, section 28, subdivision (d) (Prop. 8).

P.2d 844], cert. den. (1975) 420 U.S. 1004 [43 L.Ed.2d 763, 95 S.Ct. 1447], a year before its decision in *Disbrow,* repudiating the *Harris, supra,* 401 U.S. 222 analysis for state law purposes. ▉ Following *Harris, Nudd* found no federal error in the admission for impeachment purposes of a defendant's prior inconsistent (and inculpatory) statement. *Nudd* rejected the defendant's contention that the exception of *Harris* was inapplicable due to the trial court's failure to deliver limiting instructions on its own motion. Instead, the court adhered to the basic rule noted above: "absent request by a party, there is no duty to give an instruction limiting the purpose for which evidence may be considered. [Citations.]" *People* v. *Nudd, supra,* 12 Cal.3d 204, 209.)

*Hinman* v. *McCarthy* (9th Cir. 1982) 676 F.2d 343, certiorari denied 459 U.S. 1048 [74 L.Ed.2d 617, 103 S.Ct. 468], cited by appellant, is distinguishable. There, the prosecution presented statements obtained in violation of *Miranda* during its case-in-chief. The defendant subsequently testified in his own defense. On appeal from an order granting habeas corpus, the state argued that the *Miranda* violation was necessarily harmless as "the statement, which was offered during the State's case-in-chief, would have been admissible as part of the State's rebuttal evidence." (*Hinman* v. *McCarthy, supra,* 676 F.2d 343, 349.) No limiting instructions were given; the opinion does not indicate whether any were requested. The court rejected this attempt to protect under the *Harris, supra,* 401 U.S. 222 rule affirmative prosecutorial use of the products of *Miranda* violations; *Harris* was held applicable only to statements admitted for impeachment. Here, as in *Nudd,* the prosecution did not introduce appellant's statement during its own case. The prosecutor did not begin to lay the foundation for its introduction until his cross-examination of appellant. At the conclusion of the defense case the prosecution presented in rebuttal the tape of appellant's statement. Indeed, this is a stricter example of impeachment than *Nudd.* There, the defendant's prior inconsistent statement was inculpatory; here, it was basically exculpatory but inconsistent with his trial testimony. Unlike *Hinman,* we are not asked here to re-characterize as premature rebuttal the prosecution's direct evidence. It was clear to the court and to defense counsel that the prosecutor was offering the statement as impeachment. It was incumbent upon appellant to request appropriate limiting instructions. Thus, there is no federal *Miranda* error cognizable on this appeal. We now examine, under the standard of *Watson,* the consequences of the state law error in permitting this form of impeachment.

The jury was instructed[2] that a defendant's false or deliberately misleading statements may tend to prove a consciousness of guilt. Appellant surely knew whether he fought with anyone, and his denial of any fight might be taken as a gross departure from the truth from which a jury might infer a consciousness of guilt. Further, the jury deliberations were lengthy, and the jury foreman an-

---

[2] CALJIC No. 2.03.

nounced that the jury was hopelessly deadlocked after approximately ten ballots. The jury only reached a verdict after the court directed further deliberations. These circumstances point to the closeness of the case. Further, appellant argues that his credibility was especially significant as his mental state and actions with relation to Michael Smith were crucial. He argues that the determination of the issues of self-defense, provocation, and heat of passion depended in large measure upon its evaluation of appellant's testimony in comparison with that of the prosecution's witnesses. Appellant's version is that Smith used insulting language, and that after appellant hit Smith a few times, Smith lifted his shirt to display a knife in his waistband. Almost simultaneously, both men grabbed for his knife, and somehow Smith was stabbed. Appellant claims he did not realize that Smith had been stabbed, and that immediately after the incident he was enraged and unable to think. ■ Appellant was found guilty of second degree murder; we must determine whether it is reasonably probable that the jurors would have found the killing justified or to be manslaughter (voluntary or involuntary) had the challenged evidence not been admitted. To begin with, appellant's credibility was impeached by the introduction of his prior felony conviction; impeachment by the improperly admitted statement was thus somewhat cumulative as to the issue of appellant's credibility. Further, there was evidence from several sources showing that appellant:

(1) Returned to the party after placing his wife in the car and driving away.

(2) Had a shiny object in his hand prompting the victim to ask, "Why do you have that?" or "Why do you have that knife?"

(3) Responded, "I could have stabbed you earlier."

(4) Stated to the victim, "If we fight, one of us is going to die."

(5) Hit the victim three times, and

(6) Ran after the victim when the victim tried to get away.

(7) Made statements after the incident (e.g., "He got out of line, didn't he.") uncharacteristic of someone who has just killed in self-defense.

(8) Testified that he did not know the victim had been stabbed—an attempted evasion far more damaging than the improperly admitted statement.

(9) Testified that he had not been armed—a statement completely inconsistent with his other testimony and with the testimony of witnesses who saw in appellant's hand a shiny object (inferably a knife which he took away, as no weapon consistent with the mortal wound was found at the scene of the stabbing).

The adverse effect of this evidence could scarcely have been affected by the improper use of the un-Mirandized exculpatory statements to impeach appellant. We conclude that it is not reasonably probable that a result more favorable to appellant would have been obtained had the statement to the police not been admitted. Therefore, the error does not justify reversal of the judgment. (*People* v. *Watson, supra,* 46 Cal.2d 818.)

## II

Appellant had six prior felony convictions. Pursuant to *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1], he moved to restrict the prosecutor to using one prior felony conviction for the purpose of impeachment. Defense counsel argued that impeachment should be restricted to a 1977 burglary conviction, and that as murder and robbery are both assaultive crimes the 1971 robbery should not be used. Alternatively, appellant asked that if the 1971 robbery were used to impeach him, the crime be identified as "a felony involving theft." These motions were denied.

On cross-examination the prosecutor impeached appellant as follows:

"Q: Mr. Duran, it's true, is it not, that you were convicted on July 13th, 1977, in Santa Clara County of a felony, is that right?

"A: That's correct.

"Q: And before that, on September 30th, 1971, right here in Santa Clara County, you were convicted of another.

"A: Correct.

"Q: Just a minute—another felony, first degree robbery, is that right?

"A: Yes."

■ Appellant claims that (a) the prosecutor's description of the 1977 conviction as "a felony," without revealing the identity of the offense, was error under *People* v. *Rollo* (1977) 20 Cal.3d 109 [141 Cal.Rptr. 177, 569 P.2d 771], and (b) under *People* v. *Beagle, supra,* 6 Cal.3d 441, and Evidence Code section 352, and that the trial court abused its discretion in determining that the probative value of the 1971 robbery conviction outweighed the risk of undue prejudice.

Respondent concedes that *Rollo* was contravened, but citing *People* v. *Remiro* (1979) 89 Cal.App.3d 809 [153 Cal.Rptr. 89, 2 A.L.R.3d 1135] [cert.

den. 444 U.S. 876 (62 L.Ed.2d 104, 100 S.Ct. 160)], argues that appellant waived the point by his failure to object or bring out the nature of the prior on redirect examination. In *Remiro*, the prosecutor in his opening statement "presaged" proof that the engine in a Chevrolet van involved in the case was obtained in an earlier uncharged robbery committed by the defendant. A defense objection was overruled, and a later motion for mistrial denied. Defendants argued on appeal that they were prejudiced by this opening statement. The court, however, noted that there was no showing of bad faith on the part of the prosecution, and that the remarks were insignificant in comparison with the evidence of defendants' guilt. Accordingly the court held that the failure to request a curative admonition constituted a waiver of any claim of error on appeal. (*Id.,* at p. 841; see generally, Witkin, Cal. Criminal Procedure (1963) Reversible Error, § 747, pp. 721-722.)

Familiar guidelines to determine if there has been a waiver were applied by the Court of Appeal in *People* v. *Gaulden* (1974) 36 Cal.App.3d 942 [111 Cal.Rptr. 803]: "[T]here was no objection to any of the remarks assigned as error and this was not a closely balanced case where there is grave doubt of defendant's guilt. Moreover, none of the remarks were of such a character that they could not be obviated by any retraction of counsel or instruction of the court." (*Id.,* at p. 959.) In the present case, there was no objection or request for a curative admonition. Further, the remark was of such a character that any harmful speculation as to the nature of the offense could be readily cured by requiring the prosecutor to name the offense, or bring it out on further redirect.

■ Appellant counters that any failure of his attorney to object to his improper impeachment constituted ineffective assistance of counsel since it cannot be justified as a reasonable tactical choice. In this respect he is mistaken. The trial judge previously determined that both the 1971 robbery conviction and the 1977 burglary conviction could be used to impeach appellant. Trial counsel may reasonably have felt that random speculation was less harmful than a knowledge that the crime appellant committed was burglary. Thus, the choice not to object, even if in retrospect it was not the best choice, can at least be justified as a reasonable tactic. *People* v. *Pope* (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1], and *People* v. *Zimmerman* (1980) 102 Cal.App.3d 647 [161 Cal.Rptr. 669] are thus to be distinguished. Appellant has waived his objection to any *Rollo* error.

■ Appellant next argues that the trial court abused its discretion when it allowed impeachment with both the 1977 burglary conviction and the 1971 robbery conviction. In *People* v. *Beagle, supra,* 6 Cal.3d 441, the Supreme Court held that a trial court may admit or exclude evidence of prior felony convictions offered to impeach a witness upon balancing four factors: (1) whether the prior felony conviction reflects adversely on the defendant's honesty or veracity; (2)

whether the conviction is near or remote in time; (3) whether the conviction is for substantially similar conduct for which the accused is on trial; (4) the effect if the defendant does not testify out of fear of being prejudiced because of impeachment by prior convictions. (*People* v. *Beagle, supra,* 6 Cal.3d 441, 453.) The court must weigh the first two factors "against the probability that admission of such evidence 'will (a) necessitate undue consumption of time, or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (§ 352.)" (*People* v. *Fries* (1979) 24 Cal.3d 222, 227 [155 Cal.Rptr. 194, 594 P.2d 19].) "The third and fourth factors provide guidance in assessing the weight of these contervailing considerations." (*People* v. *Lassell* (1980) 108 Cal.App.3d 720, 724 [116 Cal.Rptr. 678].)

In *People* v. *Rollo, supra,* 20 Cal.3d 109, 118, the court noted that "different felonies have different degrees of probative value on the issue of credibility. Some, such as perjury, are intimately connected with that issue; others, such as robbery and burglary, are somewhat less relevant . . . ." (See also *People* v. *Barrick* (1982) 33 Cal.3d 115 [187 Cal.Rptr. 716, 654 P.2d 1243].) Here, the prior convictions were for robbery and burglary, both of which are at least somewhat probative on the issue of credibility.

Appellant's prior convictions occurred in 1971 (the robbery) and 1977 (the burglary). The current offense occurred in June 1979 and trial began in January 1980. The greater the remoteness of a prior conviction, the less probative value it possesses. Thus, the probative value of the 1977 burglary conviction is greater than that of the 1971 robbery conviction.

The third factor concerns the danger of undue prejudice when the prior offense is similar to the charged offense. Appellant contends that as the charged murder and prior robbery are both assaultive offenses, there was a substantial danger that the jury would use the prior robbery conviction to conclude that appellant was a violent and assaultive person. He argues that this weighs in favor of exclusion. Appellant correctly notes that the two crimes are similar in that both are assaultive. Such similarity, however, does not mandate exclusion; rather it remains within the trial court's discretion to balance the pertinent factors and arrive at a conclusion. "Trial courts are still to exercise discretion in situations in which the prior and charged offenses are less than identical. Several decisions avoid formulaic exclusion and follow the call in *Rist* and *Fries* for balancing." (*People* v. *Lassell, supra,* 108 Cal.App.3d 720, 727.) While the similarity of the charged offense and the prior felony points in the direction of exclusion, that similarity is not dispositive.

The final factor concerns the effect if the defendant forgoes testifying out of fear of being prejudiced by impeachment with the prior convictions. In the present case, that factor is absent as appellant testified.

Appellant argues that even if the robbery conviction could properly be used to impeach his testimony if that were the *only* prior felony conviction, it was an abuse of discretion for the trial court to admit it where there was an additional conviction more probative of credibility and less prejudicial.

Appellant correctly notes that the 1977 burglary conviction is more probative and less prejudicial than the 1971 robbery conviction. It is more probative because it occurred nearer in time, and less prejudicial because it does not carry the connotation of violence which is common both to murder and robbery. Appellant cites *People* v. *Zimmerman, supra,* 102 Cal.App.3d 647, for the proposition that "'[b]y analogy to the procedure directed by the Supreme Court in *People* v. *Beagle, supra,* the trial court should have controlled the situation so as to give the prosecutor adequate scope to establish beyond question that there had been a prior conviction and, at the same time, to prevent unnecessary prejudice to the defense by proving *more than one* of the priors.'" (*Id.,* at p. 657, fn. 5, quoting *People* v. *Morrison* (1977) 67 Cal.App.3d 425, 428 [136 Cal.Rptr. 650], disapproved on other grounds in *People* v. *Hall* (1980) 28 Cal.3d 143 [167 Cal.Rptr. 844, 616 P.2d 826].) In *Zimmerman,* the court held that the defendant had been denied effective assistance of counsel where "once the prosecution had succeeded in persuading the trial court to admit a second felony (the petty theft with a prior) for purposes of impeachment, counsel failed to compel the prosecutor to use this prior *both* to impeach *and* to establish appellant's ex-felon status as an element of the section 12021 charge." (102 Cal.App.3d at p. 657.) *Morrison* and *Zimmerman* are to be distinguished; each of those cases involved a charge of possession of a concealable firearm by a felon (Pen. Code, § 12021) where a prior felony conviction is an element of the crime. Proof of any single prior felony is adequate, and proof of more than one is unnecessary and prejudicial. But where the issue is credibility the presence of multiple prior felonies may be more probative than prejudicial; conviction of a single felony does not represent an adjudication of a permanent status of lack of credibility as a witness whereas conviction of several may tend to establish a character trait affecting credibility. An exercise of discretion by the trial court was called for.

*People* v. *Jardine* (1981) 116 Cal.App.3d 907 [172 Cal.Rptr. 408], also cited by appellant, cannot be so distinguished. There the Court of Appeal remarked that "[a]llowing one prior offense to be used would have been adequate to impeach [the codefendant's] character if such impeachment was to be allowed at all under the *Rollo* standard. By ruling that all three priors would be available for impeachment, the trial court apparently did not take into account the degree of prejudice that [the codefendant] would suffer from admission of the evidence." (*Id.,* at p. 916.) The court cited no authority for the implicit assumption that one prior felony is the limit when the issue is credibility, and it

appears that the real basis of the decision may have been the expressed conclusion that the trial court "seem[s] to have ignored the balancing process." (*Id.*)

We find no basis for holding that it was an abuse of discretion to allow proof of more than one felony for the purpose of impeachment. A series of crimes relevant to character for truthfulness is more probative of credibility than a single lapse, and the trial court must weigh against that value the danger of prejudice. So the trial court evidently did in the present case; no abuse of discretion appears.[3]

### III

After the jury had deliberated almost three days, the foreman informed the judge, "Members of the jury have come to the conclusion that a unanimous decision cannot be reached." The court inquired whether the foreman thought further deliberation would produce a verdict. The foreman replied, "No, I don't, your Honor." The court then asked him whether the rereading of testimony or of the instructions would be helpful. The foreman responded that it would be up to the individual jurors themselves.

The court again inquired whether further instructions or readback of testimony would help, and the foreman responded in the negative, and replied "Yes" when asked whether he was satisfied that the jury had reached a deadlock.

The following dialogue then ensued:

"THE COURT: All right. Now, let me ask you another question, and in answer to this question I want you to give me a number and nothing further. In other words, just a numerical response. How many ballots has the jury taken? Just give me a number in response to that.

"THE FOREMAN: I would say probably ten.

"THE COURT: Approximately ten? All right. As to the charge of murder, again, I would ask you to give me a numerical response only. What was the numerical breakdown on the ballot taken on the charge of murder? Again, I want numbers, either six and six or seven and five or whatever.

"THE FOREMAN: Is this on the killing itself?

"THE COURT: The charge of murder.

---

[3]Again, it is unnecessary for us to reach the possible effects of "Proposition 8" (Cal. Const., art. I, § 28, subd. (f)).

"THE FOREMAN: That would be twelve to nothing, I believe, on that charge.

"THE COURT: All right. On the voluntary manslaughter, would you give me the numerical breakdown on the last ballot?

"THE FOREMAN: One to eleven.

"THE COURT: All right. And involuntary manslaughter, would you give me the numerical breakdown on the last ballot?

"THE FOREMAN: Zero."

The court then asked each juror individually whether he or she agreed with the foreman that the jury was hopelessly deadlocked. Ten jurors, including the foreman, responded that they did not believe further deliberations would bring about a verdict. Juror number 12, however, stated that there was a possibility of a verdict although he could not predict that a verdict could be reached. The court returned the jury for further deliberations. Later the same day, the jury returned a verdict finding appellant guilty of second degree murder.

 Appellant argues that the trial court improperly coerced a verdict by inquiring into the numerical division of the jury and the number of ballots it had taken and by asking each juror individually whether further deliberations would bring about a verdict. Appellant cites *Brasfield* v. *United States* (1926) 272 U.S. 448 [71 L.Ed.2d 345, 47 S.Ct. 135], for the proposition that inquiry into the numerical division of a jury constitutes per se reversible error. He further argues that this rule is a requirement of federal due process. But the *Brasfield* rule is a matter of federal criminal procedure; it has not been followed in the California courts.

Jury coercion is essentially a factual determination, dependent upon varying circumstances. In *People* v. *Carter* (1968) 68 Cal.2d 810 [69 Cal.Rptr. 297, 442 P.2d 353], overruled on other grounds *People* v. *Gainer* (1977) 19 Cal.3d 835 [139 Cal.Rptr. 861, 566 P.2d 997, 97 A.L.R.3d 73], the court remarked that "'. . . A judge may advise, and he may persuade, but he may not command, unduly influence or coerce.'" (*Id.*, at p. 814.) The court went on to note that it is the court's statutory responsibility to assure that a verdict is rendered and "[t]he discharge of this responsibility necessarily requires that the court, in cases where the jury has been unable to reach agreement, make the indicated determination of 'reasonable probability' and . . . that it take appropriate action to encourage agreement. Thus, the court in such cases may inquire of the jury as to its numerical division without seeking to discover how many jurors are for . . . acquittal. [Citations.] The court also may, and indeed it *should,* question individual jurors as to the probability of agreement." (*Id.*, at p. 815;

see *People* v. *Finkelstin* (1950) 98 Cal.App.2d 545, 561 [220 P.2d 934].) The present record does not establish jury coercion.

## IV

Appellant argues that it was error for the trial court to impose a one-year weapon enhancement (Pen. Code, § 12022, subd. (b)) pursuant to the jury's findings that appellant used a knife in the commission of the murder. He cites *People* v. *Rogers* (1981) 124 Cal.App.3d 1071, 1082 [177 Cal.Rptr. 747], in support of this contention. The *Rogers* court noted that "[t]he real problem is that appellant was sentenced to life imprisonment on the murder and our Supreme Court has held that an enhancement pursuant to Penal Code section 12022 cannot be added to a conviction where the sentence is life imprisonment [citation]." (*Id.*)

Respondent challenges the correctness of the *Rogers* decision, citing as contrary to *Rogers*, *In re Neal* (1980) 114 Cal.App.3d 141 [170 Cal.Rptr. 452], and *People* v. *McNeill* (1980) 112 Cal.App.3d 330 [169 Cal.Rptr. 313]. *In re Neal, supra,* involved a claim that defendant's personal use of a firearm could not be used to add two years to the term fixed for parole eligibility on his indeterminate life sentence for conviction of first degree murder. The court rejected this contention, distinguishing earlier cases and discussing the difference between the indeterminate sentencing law (ISL) and the determinate sentencing law (DSL). The court noted that *People* v. *Walker* (1976) 18 Cal.3d 232, 243-244 [133 Cal.Rptr. 520, 555 P.2d 306], relied on in *Rogers,* arose under the ISL in the context of a sentence enhancement. "Under that law . . . the Adult Authority fixed the actual length of the prison term [and] a sentence under the ISL was in legal effect a sentence for the maximum term. [Citation.] Thus, once the defendant was released on parole by the Adult Authority, he nonetheless remained in 'legal custody of the department [of corrections]' for the duration of the maximum term." (*In re Neal, supra,* 114 Cal.App.3d 141, 144.) The *Walker* holding that an enhancement could not be added to a life sentence thus made sense in the context of the ISL as a defendant logically could not serve a sentence which commenced after a sentence which lasted until his death or pardon.

Referring to cases where a defendant was sentenced under the former ISL (pre-July 1, 1977), the *Neal* court noted that "[w]ith the advent of the 1976 [DSL] such line of reasoning is no longer applicable. Generally, all prison sentences, including those previously imposed under the ISL, must now be for a fixed term of imprisonment and a specific parole release date set. (§ 1170.2, subds. (a), (e) and (f); [citation].) Upon completion of such fixed term of imprisonment, the prisoner must be released on parole for a prescribed number of years [citation] and thereafter fully discharged [citation]." (*In re Neal, supra,*

114 Cal.App.3d 141, 144.) The court thus found that "[s]uch additional term neither extended the statutory period of parole eligibility (§ 3046) nor carried beyond defendant's ability to serve it during his lifetime [citation] and was properly considered . . . in calculating defendant's period of actual confinement prior to release on parole . . . ." (*Id.*, at pp. 145-146.) The reasoning in *Neal* thus indicates that appellant's contention has force only in the context of the former ISL under which enhancement of a term which necessarily lasted for life was impossible.

In another case, the court upheld an enhancement of an indeterminate sentence of from 15 years to life—the identical sentence in the present case. The court noted that "*People* v. *Walker* (1976) 18 Cal.3d 232 . . . involved a natural life sentence from which the defendant could never be discharged prior to death. It is therefore inapposite in the instant circumstances . . . ." (*People* v. *McNeill, supra,* 112 Cal.App.3d 330, 340.)

In the present case, appellant was sentenced under a statute providing that "Every person guilty of murder in the second degree shall suffer confinement in the state prison for a term of 15 years to life." (Pen. Code, § 190.) *In re Jeanice D.* (1980) 28 Cal.3d 210 [168 Cal.Rptr. 455, 617 P.2d 1087], interpreted similar statutory language as referring to an indeterminate sentence; it thus rejected the contention that the statute establishes a determinate life sentence with a minimum parole eligibility date of 15 years. Under this statute, then, the penalty for second degree murder will be fixed at a definite number of years—anywhere from 15 to life. Once this figure has been determined, a defendant would be released as soon as his term expires. It is not impossible to add an enhancement to the term decided upon so long as that term is not life. Accordingly, the language in *People* v. *Rogers, supra,* 124 Cal.App.3d 1071, is not applicable here. *In re Neal, supra,* and *People* v. *McNeill, supra,* are to be followed.

The judgment is affirmed.

Caldecott, P. J., concurred.

**RATTIGAN, J.**—I dissent.

I

I agree with the conclusion in part I of the majority opinion that the statements made to Sergeant Demkowski were obtained by him in violation of appellant's *Miranda* rights because appellant did not waive them. (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 473-476 [16 L.Ed.2d 694, 722-724, 86 S.Ct. 1602, 10 A.L.R.3d 974].) I also agree with the conclusion in part I that "the

trial court's determination that there was no *Miranda* violation was indeed palpably erroneous."

It is next held in part I that the trial court committed "state law error under *Disbrow*" in permitting the prosecution evidence of the "unlawfully obtained statements of appellant" for the purpose of impeachment (see *People* v. *Disbrow* (1976) 16 Cal.3d 101, 111-113 [127 Cal.Rptr. 360, 545 P.2d 272]), but that the error was harmless. I agree that there was *Disbrow* error. Given the conceded "closeness of this case" (the majority's description), I do not agree that the error was harmless. I return to this point below.

## II

I disagree with the conclusions in part II of the majority opinion relative to *Rollo* error. (See *People* v. *Rollo* (1977) 20 Cal.3d 109, 115-120 [141 Cal. Rptr. 177, 569 P.2d 771]; see also *People* v. *Beagle* (1972) 6 Cal.3d 441, 451-454 [99 Cal.Rptr. 313, 492 P.2d 1].) Specifically, I find *Rollo* error in the trial court's ruling which was made against an objection based on Evidence Code section 352, and which permitted appellant to be impeached with the nine-year-old robbery conviction as well as with the three-year-old conviction of burglary. The evidence of the burglary conviction impeached his credibility for all the purposes legitimately contemplated by Evidence Code section 788. The permitted use of the robbery conviction was unnecessarily cumulative for those purposes. The probative value of that conviction was diminished by its remoteness in time, as the majority opinion properly concedes, and its use inevitably prejudiced appellant because of the similarity which exists between robbery and the crime charged (murder) by reason of the assaultive character common to both. (See *People* v. *Anjell* (1979) 100 Cal.App.3d 189, 197 [160 Cal.Rptr. 669].)

In *Rollo,* the Supreme Court admonished all lower courts as follows: "By now it should be clear to all that when a defendant makes a timely objection to the introduction of evidence of a prior felony conviction for the purpose of impeaching his testimony, the trial court is under a duty (1) to determine the probative value of that evidence on the issue of the defendant's credibility as a witness, (2) to appraise the degree of prejudice which the defendant would suffer from the admission of the evidence, and (3) to weigh the foregoing two factors against each other and exclude the evidence 'if its probative value [on the issue of credibility] is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, . . .' (Evid. Code, § 352)." (*People* v. *Rollo, supra,* 20 Cal.3d 109 at p. 116; see also *People* v. *Rist* (1976) 16 Cal.3d 211, 218-223 [127 Cal.Rptr. 457, 545 P.2d 833]; *People* v. *Antick* (1975) 15 Cal.3d 79, 96-99 [123 Cal.Rptr. 475, 539 P.2d 43]; *People* v. *Jardine* (1981) 116 Cal.App.3d 907, 915-916 [172 Cal.Rptr. 408].)

The probative value of a prior conviction which has been diminished for remoteness is clearly outweighed by the probability of prejudice where the evidence of the conviction is unnecessarily *cumulative*. " '[T]he prosecution has no right to present *cumulative* evidence which creates a substantial danger of undue prejudice to the defendant.' [Citation.]" (*People* v. *Cardenas* (1982) 31 Cal.3d 897, 905 [184 Cal.Rptr. 165, 647 P.2d 569] [italics added].) This is essentially what the *Jardine* court recognized when it found *Rollo* error in a ruling which permitted the use of multiple priors for impeachment. (See *People* v. *Jardine, supra,* 116 Cal.App.3d 907 at p. 916.) Contrary to the statement in the majority opinion here, the *Jardine* court did not indulge in the "implicit assumption that one prior felony is the limit when the issue is credibility": it held in effect that the use of one prior is enough when the use of another operates to prejudice the defendant unnecessarily, which occurred in the present case.

I therefore conclude that the trial court's ruling which permitted the remote and similar robbery conviction to be used for impeachment was an abuse of discretion according to *Rollo, Jardine,* and the other authorities I have cited above. In this regard, there was no waiver in defense counsel's silence when the prosecutor used the 1977 conviction for impeachment without mentioning that it was for *burglary*. The episode had nothing to do with the trial court's abuse of discretion in permitting impeachment with the 1971 conviction of *robbery*.

III

I also disagree with the majority's disposition of appellant's contention, based on *Brasfield* v. *United States* (1926) 272 U.S. 448 [71 L.Ed. 345, 47 S.Ct. 135], that the verdict of guilt was effectively coerced when the trial court requested and received a report of numerical division of the jurors when the foreman reported that they were apparently deadlocked. The court did not ask how many jurors were for conviction or acquittal. The request having been thus limited, the majority holds that it was proper on the authority of a statement in *People* v. *Carter* (1968) 68 Cal.2d 810 [69 Cal.Rptr. 297, 442 P.2d 353]. (See *id.,* at p. 815.) The statement is contrary to the federal rule pronounced in *Brasfield* (see my fn. 1, *post*), and the majority is correct in observing that "the *Brasfield* rule . . . has not been followed in the California courts."

After the *Carter* court made the statement approving a limited request for a deadlocked jury's "numerical division," it reversed a criminal conviction on the ground that the jury had been coerced in fact. (See *People* v. *Carter, supra,* 68 Cal.2d 810 at pp. 815-821.) The statement itself is thus dictum which is not binding on this court. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 676, p. 4589.) We might feel constrained to follow it if it were persuasive, but I

question its validity because the decisions cited for it were *People* v. *Lammers* (1951) 108 Cal.App.2d 279, 280 [236 P.2d 667], and *People* v. *Curtis* (1939) 36 Cal.App.2d 306, 325 [98 P.2d 228]. (See *People* v. *Carter, supra,* at p. 815.)

In *Curtis,* the court approved the trial court's limited request for the numerical division of the jury on the authority of *People* v. *Talkington* (1935) 8 Cal.App.2d 75 [47 P.2d 368] and *People* v. *Von Badenthal* (1935) 8 Cal. App.2d 404 [48 P.2d 82]. (See *People* v. *Curtis, supra,* 36 Cal.App.2d 306 at pp. 324-326.) The court in *Von Badenthal* had reached that result on the sole authority of *Talkington.* (See *People* v. *Von Badenthal, supra,* at p. 410.) In *Lammers,* the court reached the same result on the authority of *Talkington* and *Curtis.* (See *People* v. *Lammers, supra,* 108 Cal.App.2d 279 at pp. 281-282.) The *Carter* dictum thus originates in *Talkington,* which was the first California decision analyzing *Brasfield* v. *United States.* (See *People* v. *Talkington, supra,* at p. 84.) The *Talkington* court egregiously misinterpreted the *Brasfield* rule in the process. (See *ibid.*)[1] The misinterpretation in effect pervades the holdings in *Curtis* and *Lammers,* and through them it pervades the dictum in *Carter.*

I believe that *Brasfield* should be followed in California, particularly in light of recent decisions by our Supreme Court prohibiting trial court conduct conducive to the coercion of minority members of deadlocked juries. (See *People* v. *Gainer* (1977) 19 Cal.3d 835, 847-851 [139 Cal.Rptr. 861, 566 P.2d 992]; see also *People* v. *Cook* (1983) 33 Cal.3d 400, 411 [189 Cal.Rptr. 159, 658 P.2d 86] [quoting *Gainer* and citing the necessity of preserving "values identified in that decision"].) Lacking persuasive precedent requiring that the

---

[1]The question before the United States Supreme Court in *Brasfield* was whether the trial court in a criminal case had committed reversible error by asking the jury "how it was divided numerically, . . . although a response indicating the vote in favor of or against conviction was neither sought nor obtained." (See *Brasfield* v. *Unites States, supra,* 272 U.S. 448 at p. 449 [71 L.Ed. 345 at p. 346].) The court found reversible error, stating: "We deem it essential to the fair and impartial conduct of the trial, that the inquiry itself should be regarded as ground for reversal. Such procedure serves no useful purpose that cannot be attained by questions not requiring the jury to reveal the nature or extent of its division. Its effect upon a divided jury will often depend upon circumstances which cannot properly be known to the trial judge or to the appellate courts and may vary widely in different situations, but in general its tendency is coercive. It can rarely be resorted to without bringing to bear in some degree, serious although not measurable, an improper influence upon the jury, from whose deliberations every consideration other than that of the evidence and the law as expounded in a proper charge, should be excluded. Such a practice, which is never useful and is generally harmful, is not to be sanctioned." (272 U.S. at p. 450 [71 L.Ed. at p. 346].)

The *Talkington* court cited this holding for the following statement: "While a number of cases might be cited to the effect that reversible error was not committed when the trial court simply asked as to the numerical division of a jury, the great weight of authority is to the effect, however, that reversible error is committed if the trial court, *in addition to* asking the numerical division of the jury, *also asks* as to how they have voted with reference to the guilt or innocence of the defendant." (*People* v. *Talkington, supra,* 8 Cal.App.2d 75 at p. 84 [italics added].) I have shown above that the "also" question was not asked of the jurors in *Brasfield.*

*Brasfield* rule be ignored in this state, I would apply it in the present case and find reversible error as claimed.

## IV

Whether the jury's verdict was coerced or not, the sequence in which it was finally reached is highly relevant to the question of harmless error. The jurors had deliberated for three full days before their apparent deadlock was reported to the trial court. During the long deliberations, they requested and received a rereading of the testimony given by two witnesses who had been near the scene of the fatal stabbing but who had not seen it. The jurors also requested and received a rereading of the testimony given by appellant, who was the only living eyewitness to the stabbing (and who claimed self-defense). After three days, the jurors stood at "twelve to nothing" on the "charge of murder," which meant in legal effect that they were on the brink of acquitting appellant of murder in any degree. They also stood at "[o]ne to eleven" on voluntary manslaughter and at "[z]ero" on involuntary manslaughter. I cannot guess what prompted them to find appellant guilty of murder in the second degree after that, but the pattern of indecision dramatically demonstrates the "closeness of this case." (I again use the majority's description.)

In this state of the record, I perceive a reasonable probability that a result more favorable to appellant—specifically, a verdict finding him guilty of voluntary manslaughter at worst—would have occurred in the absence of the several errors I have defined above. I am also of the opinion that the errors have produced a miscarriage of justice. I would reverse the judgment of conviction on these grounds.[2] (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 834-838 [299 P.2d 243]; see also Witkin, Cal. Criminal Procedure (1963) § 755, p. 728 [standards of appellate review in a "close case"]; Witkin, *op. cit.* (1978 supp.) § 755, pp. 1060-1061 [same].)

A petition for a rehearing was denied March 22, 1983. Rattigan, J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied June 2, 1983.

---

[2] I should acknowledge at this point that my conclusions with regard to *Disbrow* and *Rollo* error raise questions concerning the effect of "Proposition 8" (i.e., Cal. Const., art. I, § 28, subds. (d) and (f)), which was adopted by the voters after the present case was tried and the appeal was taken. According to my reading of the majority opinion, it does not reach these questions because of its holdings that the *Disbrow* error was harmless and that there was no *Rollo* error at all. (See maj. opn., fns. 1 and 3.) As I have just stated in the text, I have found a miscarriage of justice. The basis of my finding includes the *Disbrow* and *Rollo* errors, as I see them, but it is not limited to them. There is nothing in Proposition 8 which requires a miscarriage of justice to stand, and I know of no authority to the effect that it operates retroactively for purposes of an appeal which was taken before its adoption. For these reasons, I also find it unnecessary to consider Proposition 8 or its effect.