Filed 6/26/13  P. v. Alden CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| THE PEOPLE, | C067707 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F02759) |
| v. | |
| JAMES RAY ALDEN, | |
| Defendant and Appellant. | |

Defendant was convicted of murder and robbery in the stabbing death of Richard Seeger.  He was sentenced to life without the possibility of parole.  Defendant, who had recently been released from jail, and Bobby Brady, a man he had met at his transitional housing facility, were staying with Bobby's brother Tommy Brady in Tommy's apartment.[1]  The authorities arrested defendant and Bobby when they discovered some of the victim's effects in the apartment following a door-to-door search of the area surrounding the murder site.

---

[1]  We shall refer to Bobby Brady and Tommy Brady by their first names, not from disrespect, but to avoid confusion.

1

After being interrogated, defendant and Bobby were placed in the same patrol car, and their conversation before being transported was videotaped. On the videotape, Bobby accused defendant of the murder and of other things that later turned out to be untrue, but that Bobby had been told in his interrogation. Defendant denied the other things, but remained silent in the face of Bobby's accusation that he had killed the victim.

Defendant argued at trial against giving an adoptive admissions instruction on the ground there was no evidentiary basis for such an instruction, but did not otherwise object to the adoptive admissions instruction or to admission of the videotape. His appeal is based on his claim that the videotape was an exercise of his right to remain silent, and that the videotape's admission, as well as the instruction allowing the jury to construe the videotape as an adoptive admission, violated his federal Fifth Amendment right to remain silent and his Fourteenth Amendment right of due process. He further argues that to the extent he forfeited the arguments he now raises, his trial counsel rendered ineffective assistance.

We shall conclude that defendant has forfeited the arguments he makes on appeal, and that because he failed to claim when questioned on the stand that his silence in the face of Bobby's accusation was an assertion of his right to remain silent, his trial counsel did not render ineffective assistance.

FACTUAL AND PROCEDURAL BACKGROUND

Around 5:45 a.m. on April 9, 2009, a Carmichael Recreation and Park District employee discovered the body of a man lying in the parking lot of Carmichael Park. The employee had seen the man hanging around the park before, reading a newspaper, book, or magazine, and assumed that the man was homeless.[2] The man had driven a late model

---

[2] Seeger's daughter later confirmed Seeger had been living in his car.

2

silver Honda CRV; however, the employee did not see the car anywhere after discovering the body.

Deputy Alfredo Luna, who responded to the scene at Carmichael Park, recognized the victim as Richard Seeger. Deputy Luna had come into contact with Seeger a couple of weeks earlier when a false alarm went off at the library. When the officers responded to the alarm, they found Seeger seated in his vehicle in the middle of the night, reading by the parking lot lights. Seeger had nothing to do with the false alarm.

The forensic pathologist arrived at Carmichael Park at 7:25 in the morning, and found the body was still warm to the touch and rigor mortis had not yet set in. She estimated death had occurred approximately two hours earlier. A later autopsy revealed two stab wounds, one in the shoulder and one in the upper back. Both wounds were eight inches deep. Neither of the wounds would have resulted in blood spraying out, although there would have been a great deal of internal blood loss. The wound to the back was fatal and would have caused death in a very few minutes.

Seeger's car was found later that morning parked on a nearby street. An oily-type substance had been flung around the interior of the vehicle, and there was an open container of brake fluid and a burn mark on the driver's seat. One deputy theorized that someone had dumped brake fluid inside the Honda and tried to light it on fire in an attempt to destroy evidence. Brake fluid is not, however, flammable.

The victim's cell phone was not found with his body or in his car. The officers were able to determine from Seeger's phone records that the last outgoing call had been made just before 5:00 a.m. Over a period of about 30 minutes, the same number had been called five to seven times. The calls all lasted a minute and a half to two minutes each. The number, 1-800-990-2625, belonged to a fee-based phone sex provider. Aside from this half-hour block of time, the phone number did not appear anywhere else on Seeger's phone records.

The next day sheriff's department personnel went door to door in the neighborhood surrounding Carmichael Park. Sheriff's Deputy Ron Parsons and Detective Todd Henry went to a nearby apartment building, and one of their knocks was answered by Tommy. The officers went inside the apartment and saw defendant standing near the rear of the apartment in the bedroom near the bathroom, and Bobby sleeping on a pull out bed in the living room. Both Bobby and defendant were on searchable parole status.

On the kitchen table were two cellular telephones, one of which showed the same fee-based phone sex provider number the officers had found in Seeger's phone records in the outgoing call log. The officers also found boots and a black jacket that appeared to have blood on them, and a box of checks that were printed with Seeger's name. There was a knife with a red stain on it that matched the description of the murder weapon; officers had been told to look for an 8-inch knife.[3] There were three duffel bags in the kitchen that defendant claimed were his. When an officer began searching one of the bags, defendant stated, "There's only hygiene items in there." A Honda key with a key ring and an unlock/lock remote button was on top of the other items in the bag, along with a book of matches. The key was to Seeger's Honda.

Defendant and Bobby were arrested.

*Victim's Actions Prior to Murder*

Sou Saelor worked with Seeger at Domino's Pizza. Seeger was a delivery driver. The delivery drivers would usually leave work with about 40 or 50 dollars in cash from tips and mileage. When Seeger got off work around 11:00 p.m., he usually stopped by the liquor store and bought a couple of beers and a pack of Marlboro Light 100s. The

---

**3**     The stains on the boots, coat, and knife later tested negative for blood.

night before the murder, Seeger got off work around 11:10 or 11:15 p.m. Saelor followed him until he stopped off at the liquor store.

Seeger was a regular at Art's Liquor Bin near Carmichael Park, where he bought beer, vodka, and cigarettes. Seeger purchased a soft pack of Marlboro Light 100s, two cans of Icehouse beer, and two cans of Coors beer at 11:24 p.m. on April 8, 2009.

*Defendant's Actions Before and After the Murder*

During the first week of April 2009, Bobby contacted his brother, Tommy, and told him that he was no longer able to stay at the transitional housing facility in which he had been living. The facility was for people who had been released from custody and had nowhere else to go. Tommy allowed Bobby and his friend, defendant, to live with him for a few days in his Carmichael apartment.

Bobby and defendant gave Tommy a barbecue set with a knife and a fork. The knife was about eight inches long, and was later seized by police.

On the evening of April 8, 2009, defendant was with Bobby and Tommy and Tommy's girlfriend. At one point they placed a call to a phone sex number and left a joking message on the answering machine. They were in Tommy's apartment drinking and playing cards and checkers. Tommy and his girlfriend went to bed around midnight in the bedroom of the one-bedroom apartment. When Tommy went to bed, defendant and Bobby left the apartment to go downstairs to visit some neighbors. Tommy got up about 30 minutes later, and defendant and Bobby were not in the apartment, but they returned sometime later, got some beer from the refrigerator, and left again. Tommy went back to bed around 2:00 a.m.

The afternoon after the murder, someone called a sex chat line, and Bobby put the call on speaker phone while Tommy, Bobby, and defendant all listened. They all laughed about it.

Both defendant and Bobby were smokers. Defendant rolled his own cigarettes with Bugler tobacco. However, on April 9, 2009, Tommy noticed that defendant was

5

smoking Marlboro Light 110s soft pack.  He only had one pack.  When Tommy asked where defendant got the cigarettes, defendant said he found them when he was going through his stuff.

After the officers had come and defendant and Bobby had been arrested, Tommy was cleaning his apartment when he discovered a luggage tag under his bathroom rug. The tag had Seeger's name on it.  Defendant had been in the bedroom near the bathroom when Tommy answered the door to the law enforcement officers.  The only entrance to the bathroom was through the bedroom.  Bobby had been asleep in the living room when the officers came.

*Patrol Car Videotape*

Defendant and Bobby were separately interrogated.  Bobby was told blood had been found on the boots and black jacket that belonged to him.  He was also told that the phone sex number found in his phone logs also appeared on the victim's phone records.

Defendant was given his *Miranda* rights.[4]  He was told that Bobby had implicated him in the murder.  He, in turn, implicated Bobby, telling the interviewers that Bobby had been acting "a little different," had given him a bag full of clothes with a luggage tag that had someone else's name on it, and had told defendant that he "fucked . . . up" some guy that propositioned him.

After their respective interviews, the detectives placed both Bobby and defendant in the same police car for transport to jail.  The police car was equipped with a video system that recorded persons inside the vehicle.  The video recording was played for the jury without objection from defendant.

The brief recording went as follows:

"Bobby Brady:  Oh.  Fuck.  You serious dude?

---

[4]    *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).

6

"[Defendant]: You're fine, bro.

"Bobby Brady:  What?

"[Defendant]: You're fine.

"Bobby Brady:  Dude, you take the rap, man?

"[Defendant]:  I don't wanna talk about it right now, Bobby.

"Bobby Brady:  Dude, I swear to fuckin God, man, both of us are not goin down for what you did, dude.  Come on, James.  Come on dude.  They fuckin got you, man.  I'm not goin down for what you did.  They're sayin you're trying to point the fuckin finger at me.

"[Defendant]:  Course they're gonna say that, Bobby.  It's their job.

"Bobby Brady:  Hey man, did -- did you wear my boots?

"[Defendant]:  No.  I didn't wear your boots.

"Bobby Brady:  Did you wear my jacket?

"[Defendant]:  I didn't wear nothing of yours.

"Bobby Brady:  Why is there blood on my boot and blood on my jacket?

"[Defendant]:  I didn't wear nothin of your -- of your stuff from -- nothin.  Nothing.  I couldn't even wear your boots if I wanted to.

"Bobby Brady:  What did you do to that guy, man?  Huh?  James, don't let me go down for this, dude.  Come on, bro.  I mean, what's up with this 1-900 phone number or whatever?  You used his phone to call somebody?  A fuckin sex line?

"[Defendant]: I never used your phone to call any sex lines.  I'm not gonna get into that right now, man.

"Bobby Brady:  No. No. Dude -- the dude's phone.  The dude you killed, his phone.  You used his phone to call that same sex line that I called on my phone.  They're tryin to put me at the same spot was -- as you.  Sayin we both was there.  What did you tell them, man? Hmm?

"[Defendant]:  Ain't told them nothin.

7

"Bobby Brady: You didn't tell them nothin. They're sayin you said the same thing I was. I had nothin to do with it and he did everything. All I'm sayin is ride your beef, dude. You know I had nothing to do with this, bro. Am I right? Huh? Jim?

"[Defendant]: I don't wanna talk about it right now, Bob.

"Bobby Brady: You don't wanna talk about it --

"[Defendant]: Wait till we get there.

"Bobby Brady: Fuck

"[Defendant]: Wait till we get there.

"Bobby Brady: Fuck that, dude, they're gonna separate us. (Unintelligible) get all this shit out now, man. I ain't goin down for what the fuck you did bro. Fuckin murder dog, are you serious? Fuck that. And you bring all this shit back to my brother's house, bro? And I'm goin down for it too? Come on, Jim. Fuck that, dude. You don't wanna talk about it. You tell the motherfuckers it was just you, man. Go ahead: speak into the mic, dude, right there. That's dirty. That's fuckin dirty. They said they got beer cans, Bud Light, in a black bag. They said they saw a dude with a fuckin puffy black jacket -- my jacket -- wrapped around some dude's waist. There was a spot of blood on my puffy black jacket. And they said they got blood on my boot. You know those tan ones I got? So how the fuck did blood get on that shit, dude? Huh? Fuckin murder, dude. My fuckin life is over dude. What are you gonna tell them, bro? Hello?

"[Unidentified] Male: Whose jacket was that?

"Bobby Brady: Mine.

"[Unidentified] Male: Yours?

"Bobby Brady: Just tell them the truth please James. All right, bro?"

Defendant testified at trial. He told essentially the same story he had given when interrogated, saying Bobby had been "anxious" and "fidgeting" the day after the murder. He again said Bobby told him some man had propositioned him in the park earlier that morning and that he had "fucked him up." He claimed no knowledge of any of the

victim's property that had been found in the apartment.  He said he felt used and lied to by Bobby.

The prosecutor questioned defendant about the videotaped conversation in the patrol car.  He said he did not know there was a camera in the car when he first got in.  He admitted that while they were in the car, Bobby was accusing him of killing Seeger, and that he never denied it.  He claimed he was afraid of Bobby, and that he just wanted away from him.  He said he denied Bobby's other accusations to appease him.  He said that even though Bobby was handcuffed, he had been trying to get into mixed martial arts fighting, and was very capable without his hands.  He said he knew the conversation was being taped after Bobby told him to talk into the microphone.

## DISCUSSION

### I
### Forfeiture

Defendant argues his Fifth Amendment right not to incriminate himself and his Fourteenth Amendment Right to due process were violated when the trial court allowed the jury to treat his videotaped conversation with Bobby as an adoptive admission.  This argument is necessarily reduced to three claims:  (1) error in admitting the videotape, (2) error in failing to give an instruction limiting the admissibility of the videotape, and (3) error in giving an instruction allowing the videotape to be used as an adoptive admission on the ground such an instruction would violate the defendant's aforementioned rights.  As we shall demonstrate, defendant has forfeited each of these claims by failing to raise them at trial.

A.  Admission of the Videotape

A challenge on appeal to the admission of evidence is precluded unless there was a timely motion to exclude or strike the evidence on the specific ground urged on appeal.  (Evid. Code, § 353, subd. (a); *People v. Ramos* (1997) 15 Cal.4th 1133, 1171.)  As indicated, defendant did not object to the admission of the videotape.  Therefore, any

9

argument that the videotape should not have been admitted because it violated his Fifth and Fourteenth Amendment rights is forfeited.

B. Claimed Instructional Error Regarding the Videotape

Defendant's claims of instructional error regarding the videotape were also forfeited when he failed to raise such claims at trial. Specifically, defendant did not request a limiting instruction regarding the videotape and did not argue that an instruction allowing the jury to consider the videotape as an adoptive admission would violate his Fifth and Fourteenth Amendment rights.

Absent a request, the trial court is not required to give an instruction limiting the purpose for which the jury can consider the evidence. (*People v. Murtishaw* (2011) 51 Cal.4th 574, 590.) Defendant's failure to request a limiting instruction waived the issue. (*People v. Duran* (1983) 140 Cal.App.3d 485, 493.)

The trial court gave CALCRIM No. 357 as follows:

> "If you conclude that someone made a statement outside of court that accused the defendant of the crime or tended to connect the defendant with the commission of the crime and the defendant did not deny it, you must decide whether each of the following is true:

> "One, the statement was made to the defendant or made in his presence; two, the defendant heard and understood the statement; three, the defendant would, under all the circumstances, naturally would have denied the statement if he thought it was not true; and four, the defendant could have denied it but did not.

> "If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true.

> "If you decide any of these requirements have not been met, you must not consider either the statement or the defendant's response to it for any purpose."

Defendant objected to the adoptive admission instruction, but only on two grounds: (1) that such an instruction was not supported by the evidence because nothing on the tape could be construed as evidence of a guilty conscience, and (2) that the

10

instruction unfairly implied the videotape could be used to show defendant's guilty conscience, but not Bobby's guilty conscience. By failing to object to the adoptive admission instruction on the grounds it violated his constitutional right to remain silent and to due process, defendant forfeited this contention on appeal. (*People v. Bowman* (2011) 202 Cal.App.4th 353, 362-363.)

" 'Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]. [Citation.]' [Citation.]" (*People v. Battle* (2011) 198 Cal.App.4th 50, 64-65.) To determine whether there was a miscarriage of justice, we address the merits of defendant's argument that the trial court should have refrained from giving an adoptive admissions instruction because his silence was an exercise of his Fifth Amendment privilege against self-incrimination. (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.)

Defendant argues it was error for the trial court to give CALCRIM No. 357, which permitted the jury to treat his silence in the patrol car as an adoptive admission, without also instructing that silence cannot constitute an admission if the silence was an exercise of his Fifth Amendment privilege. The instruction (or lack of limiting instruction) did not penalize defendant for exercising his right to remain silent for the simple reason that he did not intend to exercise that right when he reacted to Bobby's accusations with silence. Defendant claims error was not waived because the trial court considered the argument. To the extent defendant's Fifth Amendment and due process arguments were not waived because the trial court found defendant's silence was not an assertion of his right to remain silent, the trial court correctly concluded that defendant did not assert his Fifth Amendment right to remain silent when he did not respond to certain portions of Bobby's accusations.

11

In *Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91] (*Doyle*), the United States Supreme Court held that a person's silence in the wake of *Miranda* warnings may be nothing more than an exercise of the right to remain silent, and that using that silence to impeach a person's trial testimony would be "fundamentally unfair and a deprivation of due process . . . ." (*Id.* at pp. 617-618 [pp. 97-98].) However, the California Supreme Court has consistently held that " '[i]f a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt.' [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 661.) " '[A] typical example of an adoptive admission is the accusatory statement to a criminal defendant made by a person *other* than a police officer, and defendant's conduct of silence, or his words or equivocal and evasive replies in response. With knowledge of the accusation, the defendant's conduct of silence or his words in the nature of evasive or equivocal replies lead reasonably to the inference that he believes the accusatory statement to be true.' [Citation.]" (*People v. Silva* (1988) 45 Cal.3d 604, 623-624.)

The Supreme Court has indicated that a criminal defendant's silence may not be used as an adoptive admission if the defendant has been given *Miranda* warnings, suspects that his conversation is being monitored, and intends his silence as an invocation of his constitutional right to remain silent. (*People v. Medina* (1990) 51 Cal.3d 870, 890-891.) Defendant had been given *Miranda* warnings, but his own testimony was that he

did not know until the very end that his conversation was being monitored, and he never testified that he intended his silence to be an invocation of his right to remain silent.**5**

*People v. Eshelman* (1990) 225 Cal.App.3d 1513, held that the test in applying *Doyle, supra*, 426 U.S. 610 [49 L.Ed.2d 91], must focus on the circumstances surrounding the defendant's silence. "*Doyle* need not apply to defendant's silence invoked by a private party absent a showing that such conduct was an assertion of his rights to silence and counsel. [Citation.]  On the other hand, when the evidence demonstrates that defendant's silence in front of a private party results primarily from the conscious exercise of his constitutional rights, then *Doyle* should apply." (*People v. Eshelman, supra,* at p. 1520.)

Defendant argues that the burden should not be on him to affirmatively show that he intended his silence as an assertion of the Fifth Amendment privilege, and cites a federal Ninth Circuit case, which held that a defendant's post-*Miranda* silence is " 'insolubly ambiguous' " and that the burden is not on the defendant to prove that he was exercising his *Miranda* rights in remaining silent.  (*Franklin v. Duncan* (9th Cir. 1995) 70 F.3d 75, 76, adopting the opinion of the district court at *Franklin v. Duncan* (N.D. Cal. 1995) 884 F.Supp. 1435, 1447.)

Regardless of which side had the burden of showing defendant's intent when he remained silent in the face of Bobby's accusations, the record here is clear that:  (1) defendant did not know when he refused to answer some of Bobby's accusations that their conversation was being recorded, and (2) defendant's intent was not to exercise his Fifth Amendment rights.

---

**5**    At one point during his interrogation, defendant said he did not want to answer more questions.  However, he continued to talk, and when one of the detectives told him they could talk later, and started to remind him he had indicated he did not want to answer more questions, defendant said, "I wanna get this shit taken care of man."  After that, he continued to answer questions.

Defendant took the stand at trial and was questioned extensively about his failure to deny killing Seeger. He testified that he did not know the conversation was being taped until Bobby told him to talk into the microphone. At that point the conversation was almost concluded and the damaging silence had already occurred.

He gave several reasons for not denying Bobby's accusations. At first he claimed he *had* denied the accusations, but had done so non-verbally. He then testified he was "terrified" of Bobby, who had a history of violence and was capable of fighting with his feet even though he was handcuffed. He also said he was trying to ignore Bobby and keep to himself. Defendant never claimed that he was aware that the conversation was being videotaped and he was exercising his right to silence. In fact, his silence was selective, since he denied wearing Bobby's boots and jacket, and using Bobby's phone. As the trial court found, "defendant took the stand in this case, [was] asked why he was not responding to the statements made by [Bobby] in the patrol car, and gave his explanations, which did not turn on *Miranda* or asserting a right to remain silent." The trial court also noted that defendant's silence was not categorical, but that he gave selective affirmative responses.

We reject defendant's characterization of his testimony that he was trying to get Bobby to leave him alone as an assertion of his Fifth Amendment right. Justice Brandeis, in his dissent in *Olmstead v. United States* (1923) 277 U.S. 438, 478-479 [72 L.Ed. 944, 956], characterized the right to be left alone *by the government* as a right protected by the Fourth Amendment, and stated that the use of evidence ascertained by such would be a violation of the Fifth Amendment. His dissenting opinion has no bearing on an individual's desire to be left alone by a private party, however. There is no assertion of a Fifth Amendment right to be implied by the desire to be left alone by a private party.

At no time did defendant testify that his selective silence was an exercise of his Fifth Amendment right to remain silent. Because his selective silence was not an invocation of this right, there was no error in instructing the jury that it could treat his

14

selective silence as an adoptive admission. There being no error, there was no miscarriage of justice, and defendant forfeited his argument that the instruction violated his Fifth Amendment privilege against self-incrimination and Fourteenth Amendment right of due process.

## II
## Ineffective Assistance of Counsel

Defendant also claims his trial counsel rendered ineffective assistance for the following reasons: (1) for not objecting to the admission of the videotape, (2) for not objecting to the adoptive admission instruction on Fifth and Fourteenth Amendment grounds, (3) for failing to request a limiting instruction on the admission of the videotape, and (4) for failing to correct the trial court's belief that it had a sua sponte duty to give the adoptive admission instruction.

To prevail on a claim of ineffective assistance of counsel, defendant must establish both: (1) that the representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability a more favorable result would have occurred absent the error. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126.) We defer to counsel's reasonable tactical decisions, and will reverse a conviction on appeal only if the record affirmatively discloses that counsel had no rational tactical purpose for the act or omission. (*People v. Vines* (2011) 51 Cal.4th 830, 876.) If the record sheds no light on the reason for counsel's action or inaction, the claim of ineffective assistance must be rejected unless counsel was asked for an explanation and failed to give one, or unless there simply could be no satisfactory explanation. (*Ibid*.) Defense counsel's performance cannot be considered deficient if there was no error to which counsel should have objected. (*People v. Hollinquest* (2010) 190 Cal.App.4th 1534, 1555.)

A. Failure to Object to Admission of the Videotape

Defense counsel's failure to object to the admission of the videotape was not ineffective assistance because he had a rational tactical purpose for allowing the

15

admission of the videotape.  In fact, the videotape was key to the defense theory presented, which was that Bobby committed the murder and set up defendant to take the fall.

Defense counsel began his closing argument with the following reference to the videotape:

> "*Talk into the microphone, dude. It's right there*.  You just witnessed an academy award performance by a man who knew exactly what he was doing and the audience is you.  He knew that that's who was going to see the tape that he knew that was being made of that meeting in the back of the patrol car."

Later in the closing argument defense counsel stated, "I think the patrol car video is perhaps the key to this case."  Counsel argued that Bobby knew there was a camera in the car and "damn well knew that he'd better put on the performance of his life to save his own fanny because he knew what was coming, where this thing was going to go."  He argued that Bobby was trying to incriminate defendant, while defendant was defending Bobby, and that this pointed to Bobby as the most likely culprit.  Defense counsel argued that, "A guilty guy will do everything that he can to shift blame to anybody he can shift it to."  He argued that all during defendant's interrogation he did not make up any story that "Bobby came in with blood on his hands, or something that would sound real incriminating, he kept defending him and saying, *you know, I don't think he'd do anything like this.  This is not within his character.*"  Counsel argued that Bobby, on the other hand, readily cast suspicion on defendant.  Counsel asked the jury, "As between those two states of mind, which is more consistent with a guilty conscience?"

Defendant now argues that this tactic was unreasonable.  However, our scrutiny of counsel's performance is highly deferential, and there is " 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . .' " (*In re Valdez* (2010) 49 Cal.4th 715, 729-730.)  We perceive defense counsel's decision to use the videotaped conversation to his own advantage as a sound

16

trial strategy that was well within the range of reasonable assistance, especially since we have determined that the videotape was not inadmissible as infringing defendant's Fifth Amendment right to remain silent.

B. Failing to Argue for Instructions on Fifth and Fourteenth Amendment Grounds

Defendant claims his counsel was ineffective for failing to request a limiting instruction on Fifth and Fourteenth Amendment grounds and for failing to object to the adoptive admissions instruction on Fifth and Fourteenth Amendment grounds. However, as previously discussed, defendant's selective silence when Bobby confronted him did not amount to an invocation of his right to remain silent, and defense counsel was not ineffective for failing to make a futile or unmeritorious request or objection. (*People v. Price* (1991) 1 Cal.4th 324, 387.)

C. Failure to Correct Trial Court

As defendant correctly points out, the trial court relied on a statement in the use notes to CALCRIM No. 357 which advised that the court has a sua sponte duty to give the instruction if evidence of an adoptive admission is admitted into evidence. Defendant also correctly notes that the cases on which the CALCRIM use note relies were overruled by the Supreme Court in *People v. Carter* (2003) 30 Cal.4th 1166, 1198, which held that, "[t]rial courts may certainly instruct on the matter if they think it best to do so. But, as the Evidence Code makes clear, courts are *required* to so instruct only at a defendant's request."

The statements made by the trial court in discussing the instruction indicate that the trial court would have given the instruction even if it did not have a sua sponte duty to do so. The trial court asked defense counsel if, assuming the videotape had not been admitted as an adoptive admission, it should give the instruction anyway so that the prosecutor would not get to make that argument in a vacuum. Later, in deciding to give the instruction, the trial court first referenced the CALCRIM use notes, then continued:

17

"But I also believe that if [the prosecutor] is going to argue that [the videotape constituted an adoptive admission], this instruction gives the jury the guidelines and the limits on what they can use that for. So I'm concerned [the prosecutor] would be making his adoptive admission argument without any instruction to the jury about it."

Because it is reasonably probable that the trial court would have given the instruction whether or not it had a sua sponte duty to do so, defendant cannot establish prejudice. (S*trickland v. Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674].) Moreover, there was no error in giving the instruction, as it was a correct statement of law and as defendant's selective silence was not an assertion of his right to remain silent. Thus, defense counsel's failure to correct the trial court's belief that it had a sua sponte duty to give the instruction was immaterial.

III
Adoptive Admissions Instruction

Defendant argues the trial court erred in giving the standard jury instruction on adoptive admissions (CALCRIM No. 357) without informing the jury that it could not consider defendant's silence an adoptive admission if such silence was based on an assertion of his Fifth Amendment privilege.

Defendant forfeited this argument by failing to raise it below. " 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]" (*People v. Guiuan* (1998) 18 Cal.4th 558, 570.)

Even if the argument were not forfeited, it is meritless. A claim that a defendant's admission or confession was obtained in violation of his Fifth Amendment rights is a question of admissibility to be determined by the court, not the jury. (See *People v. Carroll* (1970) 4 Cal.App.3d 52, 58 [an instruction telling the jury not to consider an admission unless it was voluntary was an impermissible redetermination of admissibility].) The trial court makes the determination of the existence or nonexistence

of a preliminary fact, and if the "evidence is admitted, the jury shall not be instructed to disregard the evidence if its determination of the [preliminary] fact differs from the court's determination of the preliminary fact." (Evid. Code § 405, subd. (b)(2).)

Defendant was not prevented from presenting evidence that his selective silence on the videotape was in fact an assertion of his right to remain silent, but after extensive questioning he failed to present such evidence. A trial court is not required to give an instruction unless it is supported by substantial evidence, and " 'unsupported theories should not be presented to the jury.' " (*People v. Marshall* (1997) 15 Cal.4th 1, 39.) As there was no factual basis for the modification defendant now claims should have been made to the standard jury instruction, there was no error in the instruction, and trial counsel was not ineffective for failing to request a modification that was not supported by the evidence.

## DISPOSITION

The judgment is affirmed.

                                                                    BLEASE           , J.

We concur:

      RAYE            , P. J.

      MAURO          , J.